In the Interest of R.D.

Appeal of R.D.

In the Interest of R.D.

Appeal of R.D.

In the Interest of R.D.

Appeal of R.D.

Superior Court of Pennsylvania.

Argued Jan. 10, 2012.
Filed April 10, 2012.
Reargument Denied June 18, 2012.

Daniel Silverman, Philadelphia, for appellant.

Michael W. Streily, Deputy District Attorney and Kevin F. McCarthy, Assistant District Attorney, Pittsburgh, for Commonwealth, participating party.

BEFORE: FORD ELLIOTT, P.J.E., SHOGAN and COLVILLE*, JJ.

OPINION BY SHOGAN, J.:

Appellant, R.D., a minor, appeals from the dispositional order entered following an adjudication of delinquency based on evidence that he attempted to kill his former girlfriend, S.D., on October 31, 2007, by hitting her in the head with a hammer and physically assaulting her.[1] For the reasons that follow, we affirm.

Appellant and S.D. attended the same high school in Mt. Lebanon, Pennsylvania, and were romantically involved from the spring of 2006 until the end of the 2006–2007 school year. In late October 2007, Appellant and S.D. exchanged text messages about meeting in order to return reside outside of his home at times when S.D. is home from school and living with her parents.

According to Appellant, the issues raised in the appeals at 787 WDA 2011 and 788 WDA 2011 have been resolved. Appellant's Brief at 77, n. 17. Accordingly, Appellant has filed a petition to discontinue the appeals at 787 WDA 2011 and 788 WDA 2011. We grant the petition.

Herein, the Honorable Kim Berkeley Clark presided over the adjudication, the disposition hearing, the evidentiary hearing, and the disposition review hearings. For the sake of consistency, we shall refer to the jurist as "the juvenile court."

---

* Retired Senior Judge assigned to the Superior Court.

1. In addition to the original appeal at 1889 WDA 2009 from the dispositional order of October 6, 2009, which resulted in our remanding for an evidentiary hearing, Appellant also appeals from several subsequent orders. The appeals at 139, 140, and 141 WDA 2011 are from orders denying the claims of court error and ineffective assistance of counsel that Appellant raised at the December 1, 2010 evidentiary hearing. The appeals at 787 WDA 2011 and 788 WDA 2011 are from orders referring Appellant for a mental health evaluation and directing the probation department to formulate a respite plan for Appellant to

each other's possessions. At the end of the school day on October 31, 2007, Appellant agreed to return S.D.'s possessions with the condition that she would take a walk with him; she complied. The two walked along a path near the Port Authority trolley tracks. While they were walking, Appellant struck S.D. in the back of her head with a hammer, causing her to fall. As she lay on the ground, Appellant physically assaulted S.D., inflicting injuries to her face and teeth. Appellant took S.D.'s cell phone from her pocket, broke it, and discarded it. During the assault, Appellant remarked that he wanted to kill himself. He also told S.D. that he had a knife. After the assault, Appellant led S.D. down the path toward a drug store, suggesting he would bandage her head.

While walking his dog, off-duty Allegheny County Detective Lawrence Carpico observed Appellant and S.D. on the path coming towards him. Appellant pulled S.D. down an embankment to avoid being seen by Detective Carpico. As Appellant reached for something in his backpack, S.D. escaped and ran toward Detective Carpico, bloody and screaming for help. She carried a hammer in her hands. Detective Carpico escorted S.D. to a nearby house as she described the assault to him and indicated that Appellant planned to jump in front of a trolley. As they walked along the path, Detective Carpico noticed a trolley stopped on the tracks. He learned from the trolley operator that someone had just been struck further along the tracks. Upon reaching a nearby residence, Detective Carpico telephoned 911. An ambulance transported S.D. to Children's Hospital, where she spent one night. As a result of the assault, S.D. suffered a 1.5 cm laceration to the back of her scalp, a fracture of her left orbital bone, loose teeth, and scratches on her hands.

After S.D. ran from Appellant, he walked toward the trolley tracks. Trolley operator John Johnson observed Appellant approach the tracks from a wooded area to the left of the tracks. They made eye contact. Mr. Johnson rang the bell and blew the horn to warn Appellant, but Appellant continued toward the tracks. Mr. Johnson applied the brakes and continued to ring the bell and blow the horn. Appellant walked into the path of the oncoming trolley and was struck. As a result of the impact, Appellant suffered severe injuries and has no memory of the assault.

During their investigation, police recovered Appellant's backpack on a hillside across from the trolley tracks. They obtained from or near Appellant's backpack a check for school lunches, a utility knife, a butcher's knife, and duct tape. Appellant suggested that the tools were for some remodeling work he had been helping a friend with after school.

Originally charged as an adult on December 10, 2007, the criminal court decertified Appellant's case and transferred jurisdiction to juvenile court on April 23, 2009. On May 12, 2009, Appellant was charged in a delinquency petition under the Juvenile Act, 42 Pa.C.S.A. §§ 6301–6357, with one count of criminal attempt to commit homicide, two counts of aggravated assault, and one count of unlawful restraint. After a pre-hearing conference on May 18, 2009, the juvenile court scheduled the case for adjudication on August 24, 2009.

After three days of testimony, the juvenile court found that the Commonwealth had "proven beyond a reasonable doubt ... the charges of criminal attempt homicide, aggravated assault causing bodily injury and unlawful restraint," and it adjudicated Appellant delinquent. N.T., 8/27/09, at 17–18. The juvenile court deferred dis-

position until October 6, 2009, and ordered a psychiatric evaluation.

After a lengthy dispositional hearing, the juvenile court entered an order committing Appellant to the Youth Development Center at New Castle. Order of Court, 10/6/09. On November 4, 2009, defense counsel, Patrick Thomassey, Esquire, filed an appeal of the October 6, 2009 order of adjudication and disposition on behalf of Appellant. While his appeal to this Court was pending, Appellant filed several requests for a remand to create a record on his claims of defense counsel's ineffective assistance. We granted Appellant's request on August 31, 2010, remanding for an evidentiary hearing before the juvenile court and relinquishing jurisdiction. As ordered, the juvenile court held a hearing on December 1, 2010, and denied Appellant's claims the following month. This timely appeal followed.

Appellant presents the following questions for our consideration:

1. Did [defense] counsel render ineffective assistance in failing to take any action to have Appellant declared incompetent to stand trial and did the [juvenile] court err in failing to inquire *sua sponte* into Appellant's competency to stand trial where Appellant's severe brain damage completely prevented him from assisting counsel in his defense?

2. Did [defense] counsel render ineffective assistance in failing to present available evidence of Appellant's good character as he himself conceded, did the lower court manufacture a strategic reason for counsel's omission that counsel himself disavowed and which made no sense anyway, and did the lower court apply an erroneous standard of review on this claim what [sic] it found that character evidence would not have changed its fact-finding and thereby conflated its earlier role as fact-finder with its present role as post-verdict determiner of legal error?

3. Did [defense] counsel render ineffective assistance in failing to object to the trial court's error in manufacturing evidence, which the court considered dispositive, that Appellant was hit by the train after the complainant told police that he had threatened to jump in front of a train where there exists no record support for this finding, and in failing to present a more compelling case that Appellant was struck by the train before the complainant met with police?

4. Did the Commonwealth violate its discovery obligations and Appellant's due process rights under *Brady v. Maryland* and *Giglio v. United States* and their progeny by failing to disclose evidence that the complainant had retained civil counsel before trial to seek money damages from Appellant, and (in the alternative) did [defense] counsel render ineffective assistance in failing to investigate and present this evidence?

5. Did the trial court err in manufacturing evidence that Appellant threatened to kill the complainant when no such evidence was ever introduced, and was [defense] counsel ineffective for failing to object or correct the court when she relied so heavily on this mistaken understanding of the record?

6. Was the evidence sufficient to sustain the adjudication for attempted murder?

7. Did [defense] counsel render ineffective assistance in failing to object to (a) the trial court's dispositional conclusion, reached without any record support and in the face of overwhelming evidence to the contrary, that the complainant will "never heal" and that her injuries will be "long-term"; and (b) the trial court's reliance in fashioning a disposition for Appellant on the failure of his parents to

express appropriate concern for the complainant?

8. With respect to the lower court's dispositional review orders, did the trial court violate the jurisdictional limitations of her dispositional authority, commit error and/or abuse her discretion by repeatedly finding that Appellant must accept the validity of the adjudication as part of his rehabilitation and treatment where at all times Appellant had permanent amnesia regarding all relevant events and was prosecuting this appeal in which he challenges the validity of that adjudication?

9. Is Appellant entitled to relief as a result of the cumulative impact of each of these errors?

Appellant's Brief at 3–4 (renumbered for ease of review; footnote omitted).[2]

▉▉▉ In the case at hand, Appellant raises several claims of juvenile court error and ineffective assistance of counsel.[3] In a juvenile proceeding, the hearing judge sits as the finder of fact. *In re A.D.*, 771 A.2d 45, 53 (Pa.Super.2001) (citation omitted). The weight to be assigned the testimony of the witnesses is within the exclusive province of the fact finder. *Id.* Our standard of review of dispositional orders in juvenile proceedings is well settled:

> The Juvenile Act grants broad discretion to the court when determining an appropriate disposition. We will not disturb a disposition absent a manifest abuse of discretion. *In re R.D.R.*, 876 A.2d 1009, 1013 (Pa.Super.2005) (inter-

nal citation omitted). Moreover, "[a] petition alleging that a child is delinquent must be disposed of in accordance with the Juvenile Act. Dispositions which are not set forth in the Act are beyond the power of the juvenile court." *In re J.J.*, 848 A.2d 1014, 1016–17 (Pa.Super.2004) (citation omitted).

*Commonwealth v. B.D.G.*, 959 A.2d 362, 366–367 (Pa.Super.2008).

With regard to ineffectiveness claims, there exists a presumption that counsel is effective, and the appellant bears the burden of proving otherwise. *In re A.D.*, 771 A.2d at 50. Therefore:

> [i]n reviewing ineffectiveness claims, we must first consider whether the issue underlying the charge of ineffectiveness is of arguable merit. If not, we need look no further since counsel will not be deemed ineffective for failing to pursue a meritless issue. If there is arguable merit to the claim, we must then determine whether the course chosen by counsel had some reasonable basis aimed at promoting the client's interests. Further, there must be a showing that counsel's ineffectiveness prejudiced Appellant's case. The burden of producing the requisite proof lies with Appellant.

*Id.*

Appellant's first issue contains two allegations: (1) the juvenile court erred in not raising the issue of Appellant's competence *sua sponte,* and (2) defense counsel was

---

**2.** In the omitted footnote, Appellant states: "Each of these questions alleges violations of both the United States and Pennsylvania Constitutions." Appellant's Brief at 3 n. 2.

**3.** We held in *In the Interest of A.P.,* 421 Pa.Super. 141, 617 A.2d 764 (1992) *(en banc),* that the Post–Conviction Relief Act, which is the remedy for adults seeking post-conviction relief, is unavailable to a juvenile. *See also In Interest of DelSignore,* 249 Pa.Super. 149, 375

A.2d 803 (1977) *(en banc )* (holding that Post Conviction Hearing Act is not available to juvenile proceeding since the child is not convicted of a crime). Consequently, in the case *sub judice,* Appellant would be denied review of his claims of ineffective assistance of counsel if not addressed on direct appeal. Thus, we will address the merits of Appellant's ineffectiveness claims.

ineffective in failing to pursue a determination of incompetence based on Appellant's amnesia, which prevented Appellant from assisting with the defense. Appellant's Brief at 23. In response, the Commonwealth argues, "it is a long settled principle in Pennsylvania that amnesia alone will not be sufficient to render a defendant incompetent to stand trial." Commonwealth's Brief at 12.

■ Pennsylvania's definition of incompetence is statutory:

[W]henever a person who has been charged with a crime is found to be substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense, he shall be deemed incompetent to be tried, convicted or sentenced so long as such incapacity continues.

50 P.S. § 7402(a). In order to establish incompetence, an appellant has the burden of proving that he was either unable to understand the nature of the proceedings against him or to participate in his own defense. *Commonwealth v. Santiago,* 579 Pa. 46, 67, 855 A.2d 682, 694 (2004).

We have explained the interplay between amnesia and incompetence as follows:

Absent evidence of a mental disability interfering with the defendant's faculties for rational understanding, it is settled that mere vacuity of memory is not tantamount to legal incompetency to stand trial. It is only where the loss of memory effects [sic] or is accompanied by a mental disorder impairing the amnesiac's ability to intelligently comprehend his position or to responsibly cooperate with counsel that the accused's guaranties to a fair trial and effective assistance of counsel are threatened and therefore incapacity to stand trial may be demonstrated.

*Commonwealth v. Epps,* 270 Pa.Super. 295, 411 A.2d 534, 536 (1979) (citing *Commonwealth v. Barky,* 476 Pa. 602, 383 A.2d 526 (1978)).

Relying on *Commonwealth v. Price,* 421 Pa. 396, 406, 218 A.2d 758, 763 (1966), *cert. denied,* 385 U.S. 869, 87 S.Ct. 136, 17 L.Ed.2d 96 (1966), our Supreme Court rejected claims of amnesia-based incompetence in *Barky* as follows:

This defendant ... is able to comprehend his position as one accused of murder, is fully capable of understanding the gravity of the criminal proceedings against him, and is able to cooperate with his counsel in making a rational defense as is any defendant who alleges that at the time of the crime he was insane or very intoxicated or completely drugged, or a defendant whose mind allegedly went blank or who blacked out or who panicked and contends or testifies that he does not remember anything. [*Price,* 421 Pa. at 406, 218 A.2d at 763.]

We believe *[Price]* is indistinguishable from the instant case, since in both cases the defendants' amnesia affected only their memories of the alleged criminal incidents. As one commentator has stated:

"In his plight the amnesiac differs very little from an accused who was home alone, asleep in bed, at the time of the crime or from a defendant whose only witnesses die or disappear before trial. Furthermore, courts, of necessity, must decide guilt or innocence on the basis of available facts even where those facts are known to be incomplete, and the amnesiac's loss of memory differs only in degree from that experienced by every defendant, witness, attorney, judge, and venireman. How much worse off is a gener-

ally amnesic defendant on trial for murder, for example, than one who remembers all but the dispositive fact: who struck the first blow?" 71 Yale L.J. 109, 128 (1961).

We do not believe that [Barky's] amnesia alone denied him either the effectiveness of counsel or the opportunity to present a defense.

*Barky,* 476 Pa. at 606, 383 A.2d at 527–528.

Here, the juvenile court addressed Appellant's competence challenge in its post-evidentiary hearing opinion as follows:

Memory loss does not automatically render a defendant incompetent to stand trial. [A] defendant who, prior to trial, sustained head injury that allegedly impaired his memory was competent, since test for competency did not require a good memory, but rather, only a memory sufficient to permit a reasonable degree of rational understanding of the proceedings. *U.S. v. Vanasse,* 48 Fed. Appx. 30, C.A. 3(Pa.) 2002.

On May 18, 2009, [A]ppellant appeared before me for a pre-hearing conference. There was no request for the court to hold a competency hearing or to cause him to submit to an evaluation to assess his competency to stand trial. There was nothing about [A]ppellant's demeanor that would have caused me to address or question his competence. Despite the injuries that he sustained nearly twenty-two months earlier, [A]ppellant ambulated into the courtroom without difficulty and appeared to have a normal degree of control over his person.

Evidence in the delinquency petition was presented to the court over a three-day period. During the trial, [A]ppellant sat alongside his attorney and spoke and responded to his attorney. I did not observe [A]ppellant display any unusual behavior that would cause me to believe that his physical injuries prevented him from assisting counsel in his defense. Appellant's physical injuries, which he sustained nearly twenty-two months before the trial in juvenile court, were, in and of itself, insufficient to place me on notice that he could not assist counsel in his defense. While I certainly am permitted, *sua sponte,* to order an evaluation to assess a juvenile's competence to stand trial, I am not required to do so, in the absence of evidence that it is needed. In this case, I was aware that [A]ppellant had been evaluated by two mental health professionals for the transfer hearing. Additionally, [A]ppellant was represented by counsel, who did not request such an evaluation and did not complain that [A]ppellant was unable to assist him in his defense.

\* \* \*

After the conclusion of the evidentiary hearing and arguments by counsel, I found that [A]ppellant was competent to stand trial. Specifically, I found that [A]ppellant had no memory of the assault due to his traumatic head injuries. However, memory loss alone does not render a defendant incompetent to stand trial. In this case, I found that [A]ppellant, who possessed superior intelligence had the capacity to understand the charges against him, to review and understand police reports and other discovery materials, to comprehend the testimony of the various witnesses, and to assist his lawyer in his defense. Appellant's case is similar to that of defendants who commit crimes during a blackout stage, while under the influence of drugs or alcohol. While they may have no memory of the incident in question, they can review the reports and witness statements and assist their lawyers in fashioning a defense. They can,

as Dr. Wright pointed out, look at the evidence and accept it or determine that it's not in their nature to have done what is charged.

Juvenile Court Opinion, 6/21/11, at 10–11, 14–15; *see also* Juvenile Court Opinion, 2/18/10, at 7–9 (setting forth pre-evidentiary hearing analysis of competence issue).

■ Upon review, we discern support in the record for the juvenile court's factual findings. At the evidentiary hearing, both experts testified that, other than the amnesia, Appellant's "ability for rational understanding is in tact [sic]," and "there were no other limitations that precluded [Appellant] from fully participating in all aspects of his hearing." N.T., 12/1/10, at 198, 201, 288. Based on the experts' opinions and Pennsylvania case law, we conclude the juvenile court did not err in not raising *sua sponte* the issue of Appellant's competence. Appellant's amnesia affected only his memory of the alleged criminal incident. *Barky*, 476 Pa. at 605, 383 A.2d at 527. Although his memory loss prevented Appellant from presenting his version of what transpired on October 31, 2007, nothing in the record indicates that it affected his ability "to intelligently comprehend his position or to responsibly cooperate with counsel." *Epps*, 411 A.2d at 536. In sum, Appellant's mere vacuity of memory is not tantamount to legal incompetence to stand trial. *Id.*

■ The record also supports the juvenile court's denial of Appellant's claim that counsel was ineffective for failing to raise a competence challenge. As discussed above, both experts testified that, other than having no memory of the critical event, Appellant had the cognitive ability to participate in the adjudication. Although defense counsel testified that Appellant's amnesia "made it very, very difficult," he agreed that Appellant:

had adequate memory of the history of their relationship, ... the volatility, the off and on again dating, not dating, text, not texting, all those kinds of things, he had information about that ... and he was able to provide that information ... [which] would help [counsel] to develop a defense in terms of context for the Court to weigh evidence.

N.T., 12/1/10, at 23, 46–47. Moreover, in response to questioning by the juvenile court during the evidentiary hearing, defense counsel testified:

THE WITNESS: He understood the contents of the police report, their various reports, and he said to me on a number of occasions, I wouldn't have done that.

THE COURT: So, he could read the reports and understand what was there and tell you that, in other words, that's not me. I would never have done such a thing, basically is what you are saying?

THE WITNESS: Yes.

*Id.* at 114. Indeed, Appellant concedes that he "understood the nature of the proceedings against him. He was not mentally ill or brain damaged in that respect." Appellant's Brief at 32. In sum, contrary to Appellant's assertions, his amnesia alone "did not deny him either the effectiveness of counsel or the opportunity to present a defense." *Barky*, 476 Pa. at 606, 383 A.2d at 528. Therefore, we agree with the juvenile court that Appellant's underlying claim regarding counsel's failure to raise a competence challenge lacks merit.

■ Next, Appellant argues that defense counsel was ineffective in failing to present character evidence. According to Appellant, his underlying claim has merit because "[t]he importance of character evidence in a criminal case has been underscored in an unbroken succession of Pennsylvania appellate decisions." Appellant's Brief at 36. Further, Appellant contends,

defense counsel had no strategic reason for failing to present good character witnesses, given the facts that (1) several people were prepared to testify to Appellant's reputation as a peaceful, law-abiding citizen, and (2) the juvenile court considered this a very close case. Appellant's Brief at 33–34 (citing N.T., 12/1/10, at 125–127, 204–206, 241–242, 255–257; N.T., 8/27/09, at 2, 11). Appellant points out that, at the evidentiary hearing, defense counsel repeatedly admitted he made a mistake in not calling character witnesses. N.T., 12/1/10, at 14–15, 96–99. Lastly, Appellant claims that the failure to call character witnesses was prejudicial because such evidence "may, in and of itself, create a reasonable doubt of guilt and, thus, require a verdict of not guilty." Appellant's Brief at 36 (quoting *Commonwealth v. Weiss,* 530 Pa. 1, 6, 606 A.2d 439, 442 (1992)).

 Appellant is correct in that the courts of this Commonwealth have long recognized the importance of character evidence. *Commonwealth v. Nellom,* 388 Pa.Super. 314, 565 A.2d 770, 776 (1989).

> [E]vidence of good character is to be regarded as evidence of substantive fact just as any other evidence tending to establish innocence and may be considered by the jury in connection with all of the evidence presented in the case on the general issue of guilt or innocence. "Evidence of good character is substantive and positive evidence, not a mere make weight to be considered in a doubtful case, and, ... is an independent factor which may of itself engender reasonable doubt or produce a conclusion of innocence."

*Commonwealth v. Luther,* 317 Pa.Super. 41, 463 A.2d 1073, 1077 (1983) (internal citations omitted). However, defense counsel's failure to call a particular witness does not constitute ineffectiveness per se.

*Commonwealth v. Johnson,* 27 A.3d 244, 247 (Pa.Super.2011) (citation omitted). "In establishing whether defense counsel was ineffective for failing to call witnesses, a defendant must prove the witnesses existed, the witnesses were ready and willing to testify, and the absence of the witnesses' testimony prejudiced petitioner and denied him a fair trial." *Id.* (quoting *Commonwealth v. Cox,* 603 Pa. 223, 268, 983 A.2d 666, 693 (2009)).

In the instant case, the juvenile court found that Appellant's underlying claim regarding character evidence had arguable merit, a conclusion with which we agree. Giving "great weight to the opinion and assessment of [defense counsel], an experienced criminal defense lawyer," the juvenile court also found that defense counsel had a strategic reason for not presenting character witnesses: where the defense sought "adjudication of a lesser-included offense as opposed to outright acquittal," such evidence was not needed. Juvenile Court Opinion, 6/21/11, at 18. With this conclusion, we cannot agree.

At the evidentiary hearing, defense counsel admitted he knew character evidence was valuable, but that he never considered the need for character witnesses based on his interpretation of the facts as a simple assault case. N.T., 12/1/10, at 13–15. However, as argued by Appellant, "this was not a simple assault case from day one." Appellant's Brief at 39. It was "a very serious case with very serious charges and repercussions." *Id.* Furthermore, the evidence does not demonstrate that defense counsel weighed various alternatives and decided, for tactical purposes, to not call any character witnesses. Thus, we cannot conclude that trial counsel had a "reasonable basis aimed at promoting [his] client's interests." *See In re A.D.,* 771 A.2d at 50 ("If there is arguable merit to the claim, we must then determine wheth-

er the course chosen by counsel had some reasonable basis aimed at promoting the client's interests.").

The sticking point in this case, however, is whether Appellant was prejudiced by the absence of character evidence. In its pre-evidentiary hearing opinion to this Court, the juvenile court explained its resolution of the prejudice question against Appellant, stating:

> In *Commonwealth v. William Luther,* our Superior Court held that character evidence could have been a major factor in the trial of [that] case since virtually the only issue was the credibility of the police witnesses versus that of appellant. *Commonwealth v. William Luther,* 317 Pa.Super. 41, 463 A.2d 1073 (1983).
>
> In this case, the evidence was overwhelming and consisted of much more that [sic] the testimony of the police (or a single witness). In this case, I was well aware of the fact that appellant was a law-abiding citizen (he had no juvenile court history prior to this case) and that he was a good student in school. Testimony from witnesses as to his good character is unlikely to have caused a different result in this case. Therefore, any error in failure to call characters witnesses is harmless. At most, the record should be remanded for the trial court to determine whether there was any reasonable basis for failure to call character witnesses, and whether such evidence would engender a reasonable doubt.

Juvenile Court Opinion, 2/18/10, at 16–17. The case was remanded, and, after hearing the proffered character witnesses at the December 1, 2010 evidentiary hearing, the juvenile court maintained its position:

> Appellant has the burden to prove that "but for" the lack of the good character testimony he would not have been adjudicated delinquent of the charges in the petition. In this case, evidence of [Appellant's] good character would have had no effect on my assessment of the evidence resulting in the adjudication of delinquency as the physical and testimonial evidence against [A]ppellant was overwhelming.

Juvenile Court Opinion, 6/21/11, at 16.

On appeal, Appellant complains that the juvenile court used an improper subjective standard to determine whether defense counsel's failure to present character evidence prejudiced Appellant. Appellant's Brief at 42 (citing *Commonwealth v. Nock,* 414 Pa.Super. 326, 606 A.2d 1380 (1992), *appeal denied,* 535 Pa. 656, 634 A.2d 219 (Pa.1993), and *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)); Appellant's Reply Brief at 1 (discussing *Strickland* ). According to Appellant, *Nock* and *Strickland* prohibit a post-conviction court from "resum[ing] its prior role as fact-finder at trial and weigh[ing] all of the evidence anew." Appellant's Reply Brief at 2.

A closer examination of Appellant's authority leads us to conclude that his reliance thereon is misplaced. In *Nock,* the appellant sought collateral relief from his murder conviction based on counsel's failure to investigate and call an eyewitness in the non-jury trial. Sitting also as the post-conviction judge, the trial court heard the eyewitness' testimony then denied the appellant relief. On appeal, the *Nock* Court reversed, concluding that counsel's ineffectiveness prejudiced the appellant because, in light of the inconsistent testimony of the Commonwealth's witness:

> [the eyewitness'] testimony that appellant did not have a gun could have provided the reasonable doubt necessary for a more favorable outcome to appellant.

This conclusion is not altered by the fact that the trial judge heard the evidence and adjudicated appellant's guilt in this case. The same judge presided over the post-sentencing hearing and heard Rogers' testimony as well as the testimony concerning the statements he made to the police. After hearing this testimony, the trial judge concluded that "there is no reasonable possibility that the result of the trial would have been different had Rogers been called to testify." Trial Court Opinion, 3/28/91, at 5. To the extent that this was a determination that appellant was not prejudiced by counsel's failure to call the witness, we have already discussed our disagreement.

*Nock,* 606 A.2d at 1383. In sum, and contrary to Appellant's interpretation, the *Nock* Court did not challenge how the trial court reviewed the prejudice issue, *i.e.*, the standard it applied; rather, it disagreed with the trial judge's decision on the merits.

In *Strickland,* the United States Supreme Court granted *certiorari* after the Eleventh Circuit Court of Appeals fashioned an "actual ineffectiveness" standard of prejudice in reviewing the defendant's *habeas corpus* petition. Specifically, the Supreme Court considered "the proper standards for judging a criminal defendant's contention that the Constitution requires a conviction or death sentence to be set aside because counsel's assistance at the trial or sentencing was ineffective." *Strickland,* 466 U.S. at 671, 104 S.Ct. 2052. The allegations of ineffectiveness included counsel's failure to present mitigating evi-

dence at the sentencing hearing, including "14 affidavits from friends, neighbors, and relatives stating that they would have testified if asked to do so." *Id.* at 675, 104 S.Ct. 2052. On collateral review, the trial court had denied relief because, *inter alia:*

> [t]he affidavits submitted in the collateral proceeding showed nothing more than that certain persons would have testified that respondent was basically a good person who was worried about his family's financial problems. Respondent himself had already testified along those lines at the plea colloquy. Moreover, respondent's admission of a course of stealing rebutted many of the factual allegations in the affidavits. For those reasons, and because the sentencing judge had stated that the death sentence would be appropriate even if respondent had no significant prior criminal history, no substantial prejudice resulted from the absence at sentencing of the character evidence offered in the collateral attack.

*Id.* at 677, 104 S.Ct. 2052. The trial court testified to its analysis when called by the prosecutor in the district court proceeding on the defendant's habeas corpus petition. *Id.* at 678, 104 S.Ct. 2052.

On review, the *Strickland* Court discussed the general standards for judging counsel's performance. *Strickland,* 466 U.S. at 687–698, 104 S.Ct. 2052. After rejecting several other standards as inappropriate for determining prejudice,[4] the *Strickland* Court held that, to demonstrate prejudice:

> error results in the omission of certain evidence, *the newly discovered evidence standard* is not an apt source from which to draw a prejudice standard for ineffectiveness claims." *Strickland,* 466 U.S. at 693–694, 104 S.Ct. 2052.

---

4. "It is not enough for the defendant to show that the errors *had some conceivable effect* on the outcome of the proceeding. . . . On the other hand, we believe that a defendant need not show that counsel's deficient conduct *more likely than not* altered the outcome in the case. . . . Even when the specified attorney

[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional error[ ], the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694, 104 S.Ct. 2052. Moreover, the *Strickland* Court advised, "[t]he governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors." *Id.* at 695, 104 S.Ct. 2052. For example, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* "[A] court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 695–696, 104 S.Ct. 2052.

Applying the prejudice standard to the facts before it, the *Strickland* Court concluded that counsel was not ineffective:

> The evidence that respondent says his [defense] counsel should have offered at the sentencing hearing would barely have altered the sentencing profile presented to the sentencing judge. As the state courts and District Court found, at most this evidence shows that numerous people who knew respondent thought he was generally a good person and that a psychiatrist and a psychologist believed he was under considerable emotional stress that did not rise to the level of extreme disturbance. Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating cir-

cumstances and, hence, the sentence imposed.

*Strickland,* 466 U.S. at 699–700, 104 S.Ct. 2052. In reaching its decision, the *Strickland* Court overlooked the trial judge's testimony regarding Appellant's ineffectiveness claims: "Our conclusions on both the prejudice and performance components of the ineffectiveness inquiry do not depend on the trial judge's testimony at the District Court hearing. We therefore need not consider the general admissibility of that testimony, although, as noted [above], that testimony is irrelevant to the prejudice inquiry." *Strickland,* 466 U.S. at 700, 104 S.Ct. 2052.

Contrary to Appellant's reading of *Strickland,* we narrowly interpret that decision as rejecting the district court's review of the prejudice issue to the extent the district court considered the trial court's testimony. The facts before us are dissimilar. Here, the juvenile court did not consider a different jurist's analysis in conducting its review of whether counsel's failure to call character evidence prejudiced Appellant. Rather, it heard the proffered witnesses and concluded that their testimony would not have changed the outcome of Appellant's adjudication "as the physical and testimonial evidence against appellant was overwhelming." Juvenile Court Opinion, 6/21/10, at 17.

In response to Appellant's *Nock/Strickland*-based argument, the Commonwealth relies on *Commonwealth v. Lambert,* 765 A.2d 306 (Pa.Super.2000), in which we addressed the same challenge in a post-conviction context. In *Lambert,* the appellant asked whether the post-conviction court judge applied an improper standard when it "reviewed the evidence presented at [the] PCRA hearing based upon whether the evidence would have made a difference to **him,** rather than utilizing the reasonable probability standard required under

the United States Constitution and Pennsylvania law." *Lambert,* 765 A.2d at 361–362 (emphasis original). We responded:

> The PCRA court's familiarity with the case does not put the court in a compromised position to assess the value of the PCRA evidence. If that were so, no judge could serve at a bench trial and again in PCRA proceedings in the same case. That result is simply not reasonable. Evidently, Pennsylvania law does not agree with Appellant's position either. *See* [*Commonwealth v. Abu–Jamal,* 553 Pa. 485, 720 A.2d 79 (1998), *cert. denied,* 528 U.S. 810, 120 S.Ct. 41, 145 L.Ed.2d 38 (1999)]. Therefore, Appellant's issue warrants no relief.

*Id.* at 363. We reach the same conclusion here.

■ Having sat as the trier of fact, the juvenile court was in the best position to assess the value of the evidence offered in support of Appellant's collateral claims. The juvenile court did not have to speculate about the rationale behind a jury's verdict or the weight a jury may have attributed to character evidence. In determining whether the proffered character evidence was of such a nature that it would have affected the outcome of the case, the juvenile court could simply recall its own fact-finding thought process in evaluating the physical and testimonial evidence and adjudicating Appellant delinquent. *Lambert,* 765 A.2d at 363; *accord Commonwealth v. Saranchak,* 581 Pa. 490, 866 A.2d 292 (2005) (affirming PCRA court's denial of claim that counsel was ineffective in presentation of mitigation evidence where PCRA court was also factfinder at degree-of-guilt hearing and evidence of intent to kill was overwhelming); *Commonwealth v. Stevens,* 559 Pa. 171, 739 A.2d 507 (1999) (affirming PCRA court's denial of claim that counsel was ineffective in presentation of mitigation evidence where PCRA court

was also factfinder at bench trial and evidence of guilt was overwhelming). Because the law supports the standard of review used by the juvenile court and we agree that there is not a reasonable probability of a different outcome, we discern no basis for disturbing the juvenile court's decision.

Next, Appellant claims defense counsel was twice ineffective with regard to the juvenile court's chronology of events. First, defense counsel failed to object to the juvenile court's error in concluding that Appellant was struck by the trolley after S.D. told Detective Carpico that Appellant had threatened to jump in front of a trolley. Second, defense counsel failed to present a more compelling case that Appellant was struck by the trolley before Detective Carpico and S.D. met on the path. Appellant's Brief at 52. In support of his argument, Appellant relies on the 911 call logs, which, he asserts, "establish that the emergency call pertaining to Appellant being struck by the train was logged in at 17:43:52 p.m. and that the call pertaining to S.D. was not initiated until 17:51:27, some 7 minutes and 35 seconds later." *Id.* (citing N.T., 12/1/10, at 35–37, Exhibits D2 and D3). Because the arguments are interrelated, we shall address them in tandem.

The juvenile court considered Appellant's chronology argument "specious," concluding that:

> [A]ppellant jumped in front of the LRV *after* the victim encountered Detective Carpico, based on the following testimony, which I found credible[:]
>
> 1. Detective Carpico testified that he was walking his dog along an access road that ran along the trolley tracks and that as he was walking along down the path with his dog, he noticed two youths approximately fifty yards down the path from him.

(1 H.T. 46) He later observed a female (the victim) walking toward him. Her face was bloodied. Her face looked swollen and she was carrying a claw hammer in her right hand. (1 H.T. 50)

2. Detective Carpico testified that as he was escorting the victim out of the woods, she told him that the person who had assaulted her was going to jump in front [of] the trolley. Afterwards, he approached a trolley that had stopped in the southbound track to let the operator know what was going on and was told that there had already been a collision with a pedestrian and a trolley in the southbound lane. (1 H.T. 54–55)

3. [S.D.], testified that, during the attack, appellant mentioned that he wanted to kill himself. He just wanted to kill himself and get it over with. (1 H.T. 101)

3. Tom Stout, the owner of Stout Flooring located on Castle Shannon Boulevard, testified that the rear parking lot of his building is located approximately two hundred yards from the LRV tracks. He stated, "Between his building and the LRV tracks, runs a wooded terrain which valleys down and goes back up. A creek runs through the valley. The LRV tracks are located on the other side of the valley. Past the LRV tracks is a path and more woods. The LRV tracks are on an equal plane as with his parking lot and the path is elevated above the tracks." (1 H.T. 193–194) On October 31, 2007, he and a few other employees were standing in the rear of the parking lot because they had just closed the shop for the evening. It was sometime after because they normally close the shop around 5:00 p.m. and they were in the rear parking lot hanging out. While standing in the parking lot Mr. Stout hear ear-piercing screams coming from a female who cried out three times, "Help me." (H.T.194) Mr. Stout and another employee started over the hillside towards the screams but had to back track because of the bad terrain and creek. As they were backtracking, the LRV was coming "and it was laying on its horn like no tomorrow." (1 H.T. 195)

5. John B. Johnson explained that on October 31, 2007 he was operating the outbound trolley during rush hour. As he was traveling Castle Shannon Boulevard in Mount Lebanon, he was coming around a bend when he noticed a young male *alone* coming from the wooded area to his left crossing the tracks. "We made eye contact and I blew my horn, rang the bell. The gentleman did not stop. I started to brake down." (1 H.T. 152) Mr. Johnson continued, "As soon as I seen him, I covered the brakes, started to slow the trolley down, and I was blowing my horn and the bell at the same time to alert him I'm coming[."] Mr. Johnson stated that he blew the horn and the bell for about twenty seconds or so. (1 H.T. 155)

The testimony, set forth above, clearly supports my conclusion that appellant jumped in front of the LRT *after* the victim encountered Detective Carpico.

Juvenile Court Opinion, 6/21/11, at 23–24 (emphasis in original).

Our independent review of the record confirms support therein for the juvenile court's factual findings. S.D. testified that, after Appellant pulled her over the embankment and while he was "trying to

get something out of his backpack," she "spun around, ran back up the embankment and started screaming and running towards the person [they] had seen." N.T., 8/24/09, at 107. Detective Carpico testified that, when he encountered S.D., she was "calling out, asking for help." *Id.* at 51. Mr. Stout explained that the screams for help he heard could not have come from someone on the trolley "[b]ecause the trolley wasn't there yet . . . the screaming took place first." *Id.* at 196. As Detective Carpico escorted S.D. down the path, he approached a stopped trolley to warn the operator, based on S.D. telling the detective that Appellant spoke of jumping in front of the trolley, and learned that a collision had occurred. *Id.* at 54–55. The witnesses' testimony leads to a reasonable inference that S.D. escaped, called for help, and reached Detective Carpico as Appellant ran down the hill toward the tracks. As S.D. was walking back up the path with Detective Carpico, telling him of Appellant's intentions, Appellant jumped in front of the trolley. The trier of fact was responsible for resolving any inconsistencies among the witnesses' testimony, the timing of the 911 calls, and Appellant's theory that S.D. was the aggressor. As was its right, the juvenile court chose to resolve the inconsistencies in favor of S.D.'s version of events. Thus, we discern no basis for disturbing the juvenile court's conclusion that Appellant jumped in front of the trolley *after* S.D. encountered Detective Carpico.

 As for the ineffectiveness component of Appellant's third issue, we reiterate well settled rules: "When briefing the various issues that have been preserved, it is an appellant's duty to present arguments that are sufficiently developed for our review. The brief must support the claims with pertinent discussion, with references to the record and with citations to legal authorities." *Commonwealth v. Hardy,* 918 A.2d 766, 771 (Pa.Super.2007), *appeal denied,* 596 Pa. 703, 940 A.2d 362 (2008) (citations omitted); *Commonwealth v. Whitaker,* 30 A.3d 1195, 1197 n. 7 (Pa.Super.2011); Pa.R.A.P. 2119(b). We "will not act as counsel and will not develop arguments on behalf of an appellant. Moreover, when defects in a brief impede our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived." *Hardy,* 918 A.2d at 771.

Here, when questioned at the evidentiary hearing about the 911 calls, defense counsel testified that, although he had possession of the transcripts, he had no reason for not introducing them at the adjudication. N.T., 12/1/10, at 35–37. On appeal, however, Appellant fails to conduct a comprehensive ineffectiveness analysis based on defense counsel's admissions. Indeed, the argument portion of Appellant's Brief does not contain meaningful discussion of, or citation to, relevant legal authority regarding ineffectiveness claims generally or, specifically, defense counsel's failure to present a compelling case that Appellant was struck by the trolley before S.D. met Detective Carpico. Appellant's Brief at 52–59. Instead, Appellant restricts his arguments to challenging the juvenile court's chronology. This lack of analysis does not allow meaningful appellate review. Accordingly, because Appellant's argument on the issue of counsel's ineffectiveness fails to set forth any meaningful discussion, we conclude that this issue is waived. *Hardy,* 918 A.2d at 771; Pa.R.A.P. 2119(b).

 Appellant's fourth issue contains two allegations. First, Appellant claims the Commonwealth violated its discovery obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by not disclosing to the defense

that S.D.'s family hired civil counsel, Attorney John Gismondi, before the adjudicatory hearing to bring an action against Appellant for money damages. Appellant's Brief at 59. In response, the Commonwealth contends it did not violate *Brady* because the information about a civil suit was not in its exclusive possession. Commonwealth's Brief at 22. Second, Appellant claims defense counsel was ineffective in failing to investigate and present evidence of S.D.'s financial interest in a civil suit and resulting bias which could have been used to impeach her credibility. Appellant's Brief at 60.

 "To establish a *Brady* violation, appellant must demonstrate that the evidence at issue was favorable to him, because it was either exculpatory or could have been used for impeachment; the prosecution either willfully or inadvertently suppressed the evidence; and prejudice ensued." *Commonwealth v. Spotz*, 610 Pa. 17, 70–73, 18 A.3d 244, 275–76 (2011) (citation omitted). "The evidence at issue must have been 'material evidence that deprived the defendant of a fair trial.' ... 'Favorable evidence is material ... if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (citations omitted). No *Brady* violation occurs, "where the parties had equal access to the information or if the defendant knew or could have uncovered such evidence with reasonable diligence." *Commonwealth v. Grant*, 572 Pa. 48, 54–55, 813 A.2d 726, 730 (2002).

Here, the juvenile court disposed of Appellant's *Brady* claim as follows:

There is no evidence in the record that establishes that the victim and her family had retained counsel for the purpose of bringing a civil action for damages against [A]ppellant and his family. And there is no evidence that the prosecution is or was aware that the victim's family had retained counsel or that this fact violates [Appellant's] right to due process under the Fourteenth Amendment.

Juvenile Court Opinion, 2/18/10, at 20.

At the evidentiary hearing [defense] counsel testified that he was familiar with Attorney John Gismondi. [Counsel] testified that he observed Mr. Gismondi at every hearing (with the victim and her family) and assumed that he was going to file a civil suit. (6 H.T. 26[) ] Lawsuits are public information. The issue of whether the victim and her family had filed a civil law suit [sic] was available to defense as well as the prosecution. The Commonwealth did not withhold evidence in this case.

Juvenile Court Opinion, 6/21/11, at 35.

Upon review, we conclude the record supports the juvenile court's analysis, which acknowledged the proverbial elephant in the room. There was no testimony at the evidentiary hearing that anyone actually knew S.D.'s family hired Attorney Gismondi and/or why he attended all the proceedings. N.T., 12/1/10. However, defense counsel, Patrick Thomassey, Esquire, testified that he saw Attorney Gismondi in attendance at the various hearings and proceedings, knew him to be a civil lawyer, and expected, or could reasonably infer, there would be a civil suit against Appellant. *Id.* at 26–31, 239–240. Even Appellant acknowledges that Mr. Thomassey "was also aware that Mr. Gismondi represented S.D. in the civil proceedings." Appellant's Brief at 59. Thus, information about Mr. Gismondi's retention by S.D.'s family was not in the Commonwealth's exclusive possession. *Grant*, 572 Pa. at 54–55, 813 A.2d at 730. Therefore, we agree that no *Brady* violation occurred.

As for the ineffectiveness component of his fourth issue, Appellant contends defense counsel "should have impeached S.D. with evidence of her financial interest in having his client convicted" and that "he had no strategic reason to fail to present this evidence." Appellant's Brief at 60. In support of his claim, Appellant directs us to defense counsel's concessions at the evidentiary hearing about his ineffectiveness. *Id.* (citing N.T., 12/1/10, at 27–31). In response, the Commonwealth suggests that, "even assuming *arguendo* that he has raised a claim of arguable merit and that counsel had no reasonable basis for foregoing this line of questioning," Appellant "has failed to prove that he was prejudiced thereby." Commonwealth's Brief at 23. We agree.

Introduction of the existence of the civil suit in a criminal case is permissible "to show the complainant's possible bias and interest in the outcome of the case." *Commonwealth v. Hanford*, 937 A.2d 1094, 1099 (Pa.Super.2007), *appeal denied*, 598 Pa. 763, 956 A.2d 432 (2008). However, we have held that a defendant cannot demonstrate prejudice where counsel did not introduce evidence of a civil trial because discussing the lawsuit with the victims may have demonstrated the sincerity of their cause and the defense stressed the appellant's non-criminal state of mind, an issue unaffected by any potential bias shown by the civil action. *Commonwealth v. Nichols*, 692 A.2d 181, 185 (Pa.Super.1997).

Arguably, introducing evidence of the civil suit may have hampered the defense by demonstrating the sincerity of S.D.'s cause. *Nichols*, 692 A.2d at 185. Moreover, any potential bias shown by the civil action would not affect the issue of Appellant's intent. *Nichols*, 692 A.2d at 185. Thus, we cannot fault defense counsel's omission. Additionally, the record indicates that the juvenile court was aware of Mr. Gismondi's regular presence at the proceedings and understood why he was there: "Certainly in Allegheny County everybody knows what Mr. Gismondi does ... and ... quite frankly, I saw Mr. Gismondi sitting there. I can put two and two together." N.T., 12/1/10, at 301, 312. As for the possibility of prejudice, the juvenile court opined that, "[w]hen weighed against the overwhelming evidence presented at trial it is unlikely (and almost impossible) that evidence of a pending lawsuit would have changed the outcome of this case." Juvenile Court Opinion, 6/21/11, at 36. We agree and discern no prejudice to Appellant.

Appellant's fifth issue also contains two allegations: (1) the juvenile court erred in manufacturing and then relying on evidence that Appellant threatened to kill S.D. a few weeks before the assault, and (2) defense counsel was ineffective in failing to object to and correct the juvenile court's statements. Appellant's Brief at 65. Initially, we reject Appellant's accusation that the juvenile court manufactured evidence in favor of the juvenile court's explanation:

> Appellant refers to the testimony of his friend, [A.G.], who testified that approximately three weeks before the incident in question, [A]ppellant told him that "he wanted to rape and kidnap her (the victim's) sorry ass." (1 H.T. 157) In announcing [the verdict], I *misquoted the witness* as stating that [A]ppellant told him that "he wanted to rape and kill the victim's sorry ass." (4 H.T. 14)

Juvenile Court Opinion, 6/21/11, at 18 (emphasis supplied). Our review of the record provides no indication that the juvenile court manufactured evidence of an intent to kill, as opposed to misquoting A.G.'s testimony. N.T., 8/27/09, at 11–16. At one point in his brief, even Appellant retreats, calling the juvenile court's reliance

on the "non-existent threat to kill ... *an unintended mistake* for sure." Appellant's Brief at 66 (emphasis supplied).

As for the merits of this issue, Appellant claims the juvenile court committed reversible error because the record does not support its factual finding that Appellant threatened to kill S.D. three weeks before the incident. Appellant's Brief at 64. Moreover, Appellant argues, A.G. testified that Appellant's threat was a joke; as such, it was not reliable evidence of Appellant's intent to kill S.D., so the juvenile court erred in relying on it. *Id.* at 66. In response, the juvenile court stated:

> While I acknowledge that I misquoted the witness, this piece of evidence was a small part of the evidence that I considered in reaching my verdict. I considered all of the evidence presented to the court during both the testimony of the prosecution and defense witnesses. The evidence in this case was overpowering and the fact that I misquoted a witness is, at best, harmless error and should not disturb the verdict in this case.

Juvenile Court Opinion, 6/21/11, at 19.

Our review of the record confirms that the juvenile court considered all of the evidence in deciding whether Appellant intended to kill S.D. In announcing its decision, the juvenile court discussed: (1) the items found in or around Appellant's backpack; (2) the defense's explanation for those items, which did not justify the butcher knife; (3) the text messages from Appellant to S.D., containing a gravestone inscription and lyrics from *The Last Day on Earth;* (4) Appellant's destruction of S.D.'s cell phone; (5) Appellant's threat while walking with S.D. to kill himself; (6) Appellant throwing himself in front of the trolley; (7) A.G.'s testimony about Appellant's earlier threat concerning S.D., which A.G. considered a joke; (8) A.G.'s post-accident letter to Appellant in which A.G.

apologized for not taking Appellant seriously; and (9) the expert testimony. N.T., 8/27/09, at 11–16. Moreover, although Appellant questions the juvenile court's reliance on a threat meant as a joke, the record indicates that A.G. initially thought Appellant was joking when he threatened to hurt S.D.; however, after the accident, A.G. apologized to Appellant in a letter for not taking him seriously. N.T., 8/24/09, at 174–75, 178–79. A.G.'s testimony supports a reasonable inference that Appellant wanted to hurt S.D. As the trier of fact, the juvenile court was free to consider A.G.'s testimony and conclude that Appellant did, in fact, make a threat about hurting S.D. three weeks before this incident. Therefore, based on all the evidence and reasonable inferences indicating Appellant's intent, we conclude that, even though the juvenile court misstated A.G.'s testimony, it did not commit reversible error by basing its decision on non-existent evidence.

■ Turning to the ineffectiveness component of Appellant's fifth issue, we conclude he has waived it. As stated previously, arguments in an appellate brief not appropriately developed or lacking citation to pertinent authority are waived. *Whitaker,* 30 A.3d 1195, 1197 n. 7; Pa. R.A.P. 2119(b). Here, the argument portion of Appellant's Brief does not contain meaningful discussion of, or citation to, relevant legal authority regarding ineffectiveness claims generally or, specifically, defense counsel's failure to correct the juvenile court's misstatement of A.G.'s testimony. Appellant's Brief at 65–66. Instead, Appellant restricts his arguments to challenging the juvenile court's reliance on non-existent evidence of intent. This lack of analysis does not allow meaningful appellate review. Accordingly, because Appellant's argument on the issue of counsel's ineffectiveness fails to set forth any

meaningful discussion, we conclude that this issue is waived. *Hardy,* 918 A.2d at 771.

■ Next, Appellant challenges the sufficiency of the evidence supporting the adjudication of delinquency on the attempted murder count. Appellant's Brief at 67. Our standard of review for challenges to the sufficiency of the evidence is well established:

> [W]e must determine whether, viewing all the evidence admitted at trial, together with all reasonable inferences therefrom, in the light most favorable to the Commonwealth, the trier of fact could have found that each element of the offenses charged was supported by evidence and inferences sufficient in law to prove guilt beyond a reasonable doubt. This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Moreover, it is the province of the trier of fact to pass upon the credibility of witnesses and the weight to be accorded the evidence produced. The factfinder is free to believe all, part or none of the evidence. The facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence, but the question of any doubt is for the [factfinder] unless the evidence be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

*In re T.B.,* 11 A.3d 500, 504 (Pa.Super.2010).

■ Under the Pennsylvania Crimes Code, "[a] person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step towards the commission of the crime." 18 Pa.C.S.A. § 901(a). If a person takes a substantial step toward the commission of a killing, with the specific intent in mind to commit such an act, he may be convicted of attempted murder. *Commonwealth v. Dale,* 836 A.2d 150, 152 (Pa.Super.2003) (citation omitted); 18 Pa.C.S.A. §§ 901, 2502. "The substantial step test broadens the scope of attempt liability by concentrating on the acts the defendant has done and does not any longer focus on the acts remaining to be done before the actual commission of the crime." *Commonwealth v. Gilliam,* 273 Pa.Super. 586, 417 A.2d 1203, 1205 (1980). The Commonwealth may establish the *mens rea* required for first-degree murder, specific intent to kill, solely from circumstantial evidence. *Commonwealth v. Schoff,* 911 A.2d 147, 160 (Pa.Super.2006).

Here, after three days of receiving evidence, the juvenile court summarized its conclusion that Appellant had the specific intent to kill and that he took a substantial step in furtherance of the crime of homicide:

> I do believe that the two of them agreed to meet in order for [sic] to exchange items. And even though there was an offer, apparently, from his mother to return items, both of them decided that they wouldn't do that. So they met, he did return items, and at some point during this walk, I do believe her when she says that she was hit from behind, she fell to the ground, I believe she was punched repeatedly about the head and the face, that that's how the injuries occurred. I do believe he took the cell phone. The evidence shows that he took the cell phone out of her pocket, he broke it. I believe that, common sense tells me that the purpose for that was to prevent her from calling. I believe that he had the other items there

to do what he threated to do, and as she stated, that afterwards he was going to kill himself. I believe that the presence of Detective Carpico stopped it. And she got up, she was able to get away, and he threw himself onto the T-tracks. N.T., 8/27/09, at 16–17. In its opinion to this Court, the juvenile court provided additional bases for its conclusion that the evidence was sufficient to support Appellant's attempted murder conviction:

> I found that that [sic] appellant used a hammer, "a deadly weapon" to strike [S.D.] in the back of her head and her face. This fact alone was sufficient to establish that appellant intended to kill her. However, I also considered the fact that appellant lured the victim to a secluded place and discouraged her friend, Annie Z., from accompanying them. The contents of appellant's backpack, which I found to be instruments of crime and other deadly weapons, support my [finding] that it was his intention to kill [S.D.] The explanation offered by the defense, that the items were in appellant's possession because he was helping a friend do home repairs, made no sense.

> Finally, the fact that appellant threatened to kill himself by throwing himself under the trolley and then actually threw himself under a moving trolley proved to this fact finder, that appellant intended to kill the victim and then kill himself.

Juvenile Court Opinion, 2/5/10, at 11.

Upon review, we discern no basis to disrupt the juvenile court's disposition. The record supports its findings of fact. Three weeks before the assault, A.G. heard Appellant make a threat about hurting S.D. N.T., 8/24/09, at 175. Appellant and S.D. met after school on October 31, 2007. *Id.* at 88. After Appellant returned S.D.'s books, they went for a walk alone down the isolated path. *Id.* at 89–90. At one point, Appellant was not beside S.D.; "a split second" later, Appellant hit S.D. from behind with a hammer, sat on her, took her phone, and physically assaulted her about her head and face. *Id.* at 95–98, 102–03. During their walk, Appellant had told S.D. that he wanted to kill himself. *Id.* at 101. When Detective Carpico appeared on the path, Appellant pulled S.D. over an embankment to avoid detection. *Id.* at 106. While Appellant tried "to get something out of his backpack," S.D. was able to escape and ran to Detective Carpico, bloody, bruised, and carrying a hammer. *Id.* at 50, 107. As Detective Carpico led S.D. to safety, he learned that someone had thrown himself in front of a trolley. *Id.* at 54. The trolley driver saw Appellant appear from a wooded area and walk into the trolley. *Id.* at 152. The driver rang the bell and blew the horn to warn Appellant. *Id.* A local carpet vendor heard a female calling out for help. *Id.* at 194. As he went to investigate and then backtrack because of the terrain, he heard the trolley bell ringing and the horn blowing, as if trying to alert someone of danger. *Id.* at 195.

Viewing this evidence and all reasonable inferences in the light most favorable to the Commonwealth as the verdict winner, we agree with the juvenile court that the evidence was sufficient to sustain Appellant's adjudication of delinquency on the attempted murder count. Appellant's contrary claim fails.

 Alleging both court error and ineffective assistance of counsel, Appellant's seventh issue presents a very narrow challenge to the juvenile court's remarks at the disposition hearing. First, Appellant claims the juvenile court improperly based its disposition on unsupported assumptions that S.D.'s injuries were long-term or that she was not "completely

healed" and on "the failure of Appellant's parents to demonstrate ... appropriate concern for S.D." Appellant's Brief at 71–73 (quoting N.T., 10/6/09, at 45–46; Juvenile Court Opinion, 6/21/11, at 21–22). Second, Appellant argues that defense counsel was ineffective for not objecting to the juvenile court's remarks. *Id.* at 72. The Commonwealth counters that Appellant's challenges are moot because he has been released from the original placement. Commonwealth's Brief at 28.

As a general rule, an actual case or controversy must exist at all stages of the judicial process, or a case will be dismissed as moot. *In re Duran,* 769 A.2d 497 (Pa.Super.2001). "An issue can become moot during the pendency of an appeal due to an intervening change in the facts of the case or due to an intervening change in the applicable law," *In re Cain,* 527 Pa. 260, 263, 590 A.2d 291, 292 (1991). In that case, an opinion of this Court is rendered advisory in nature. *Jefferson Bank v. Newton Associates,* 454 Pa.Super. 654, 686 A.2d 834 (1996). "An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect." *Johnson v. Martofel,* 797 A.2d 943, 946 (Pa.Super.[2002] ); *In re T.J.,* 699 A.2d 1311 (Pa.Super.1997).

\* \* \*

■ Nevertheless, this Court will decide questions that otherwise have been rendered moot when one or more of the following exceptions to the mootness doctrine apply: 1) the case involves a question of great public importance, 2) the question presented is capable of repetition and apt to elude appellate review, or 3) a party to the controversy will suffer some detriment due to the decision of the trial court. *Erie Insurance Exchange v. Claypoole,* 449 Pa.Super. 142, 673 A.2d 348 (Pa.Super.1996); *Commonwealth v. Smith,* 336 Pa.Super. 636, 486 A.2d 445 (Pa.Super.1984).

*In Re D.A.,* 801 A.2d 614, 616 (Pa.Super.2002) (quotations and citations in original).

Here, following the dispositional hearing on October 6, 2009, the juvenile court ordered that Appellant be placed in the Youth Development Center at New Castle. On April 11, 2011, the juvenile court released Appellant from this placement. Because Appellant has been released, his challenge to the juvenile court's remarks at the October 6, 2009 dispositional hearing is moot. *In Interest of McDonough,* 287 Pa.Super. 326, 430 A.2d 308, 313 (1981). Moreover, Appellant neither raises any exceptions to the mootness doctrine nor challenges the probationary disposition in the context of this issue. Therefore, the continued supervision by the juvenile probation office is not before us in the context of this issue. *Id.*

■ Regarding the ineffectiveness component of Appellant's seventh issue, we conclude he has waived it as well. As stated twice previously, arguments in an appellate brief not appropriately developed or lacking citation to pertinent authority are waived. *Whitaker,* 30 A.3d 1195, 1197 n. 7; Pa.R.A.P. 2119(b). Here, the argument portion of Appellant's Brief does not contain meaningful discussion of, or citation to, relevant legal authority regarding ineffectiveness claims generally or, specifically, defense counsel's failure to object to the juvenile court's remarks about S.D.'s injuries and the demeanor of Appellant's parents. Appellant's Brief at 72. Instead, Appellant restricts his arguments to challenging the juvenile court's reliance on impermissible factors in reaching a disposition. This lack of analysis does not allow meaningful appellate review. Accordingly, because Appellant's argument on the issue of counsel's ineffectiveness fails to set

forth any meaningful discussion, we conclude that this issue is waived. *Hardy*, 918 A.2d at 771; Pa.R.A.P. 2119(b).

 In his eighth issue, Appellant protests that the juvenile court exceeded its authority during the post-disposition review period by repeatedly denying him release because he would not offer:

an expression of remorse despite his traumatic head and brain injuries which resulted in undisputed memory loss, despite the common sense reality that he could not make truthful and knowing statements of any kind and despite his pending appeal founded upon meritorious grounds.

Appellant's Brief at 76. According to Appellant, the juvenile court's post-disposition demands for a confession violate his Fifth Amendment right to remain silent, his Fourteenth Amendment right to due process, and his Sixth Amendment right to counsel. *Id.* at 75–78. In response, the Commonwealth suggests that this issue is also moot. Commonwealth's Brief at 28.

We decline to find this issue moot based on Appellant's implied challenge to the probationary disposition:

While Appellant has been released from secure detention, he remains subject to disposition review by the lower court and to have conditions imposed by the probation department[,] which continue in the quest to seek acceptance of the adjudication, now as a condition for compliance and requirement for release from electronic monitoring and the supervision of the probation department and court.

Appellant's Brief at 74. Because Appellant remains on probation and, therefore, subject to the juvenile court's control, we shall review this issue.

 The Juvenile Act grants broad discretion to the trial courts in implementing dispositions. *In re L.A.*, 853 A.2d 388, 394 (Pa.Super.2004). Thus, a reviewing court will not disturb the disposition implemented by the lower court absent "a manifest abuse of discretion." *In re Love*, 435 Pa.Super. 555, 646 A.2d 1233, 1238 (1994), *appeal denied*, 540 Pa. 579, 655 A.2d 511 (1995). The purposes of the Juvenile Act include, *inter alia:*

(2) Consistent with the protection of the public interest, to provide for children committing delinquent acts programs of supervision, care and rehabilitation which provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable children to become responsible and productive members of the community.

(3) To achieve the foregoing purposes in a family environment whenever possible, separating the child from parents only when necessary for his welfare, safety or health or in the interests of public safety.

42 Pa.C.S.A. § 6301(b)(2), (3).

Additionally, we recently observed that: "[t]he Fifth Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). "[T]he availability of the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." *Estelle v. Smith*, 451 U.S. 454,

462, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (citation omitted). The Fifth Amendment privilege against self-incrimination can be asserted in any proceeding "in which the witness reasonably believes that the information sought, or discoverable as a result of his testimony, could be used in a subsequent state or federal criminal proceeding." *United States v. Balsys*, 524 U.S. 666, 672, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998).

It is well-settled that the Fifth Amendment is applicable to juvenile proceedings that decide the issue of guilt and whether to adjudicate a juvenile delinquent. *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

*Commonwealth v. Brown*, 26 A.3d 485, 494 (Pa.Super.2011).

Although *Brown* was a decertification case, we consider its reasoning instructive. Therein, we reviewed a juvenile's Fifth Amendment challenge to the trial court's consideration of one of the factors for transferring a juvenile's case from the criminal court: "whether the child is amenable to treatment, supervision or rehabilitation as a juvenile," 42 Pa.C.S.A. § 6355(a)(4)(iii)(G). We analyzed the challenge as follows:

> The trial court accepted the testimony of the Commonwealth's expert, Dr. O'Brien, that Appellant was not amenable to treatment and could not be rehabilitated unless he took responsibility for his actions. Relying on Dr. O'Brien's testimony, the trial court concluded that Appellant failed to establish that he was amenable to treatment because Appellant would not "come forward and take responsibility for his actions[.]" T.C.O., 3/29/10, at 14. However, in order to accept responsibility for his actions, Appellant would necessarily have to admit guilt and incriminate himself. In es-

sence, because Appellant did not concede guilt as a matter of fact, the trial court concluded that Appellant failed to establish that he was amenable to treatment as a matter of law. The trial court, therefore, interpreted and applied 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) to effectively require Appellant to admit and discuss his involvement in the actions constituting the criminal offenses.... [T]he trial court's application of 42 Pa. C.S.A. § 6355(a)(4)(iii)(G) violated Appellant's rights against self-incrimination by, in essence, concluding that Appellant had to admit guilt to prove amenability to treatment and obtain transfer to juvenile court.

*Brown*, 26 A.3d at 498.

Here, the juvenile court addressed Appellant's constitutional challenge to the probationary disposition as follows:

> At the post-dispositional phase, when reviewing [a] juvenile's placement and deciding whether the juvenile offender has met treatment goals and can be discharged from placement and returned home, the judge must continue to pay balanced attention to community protection, victim awareness and accountability, and competency development.
>
> With respect to community protection and victim awareness and accountability, the judge often looks to the juvenile to demonstrate that he has achieved these goals. Our juvenile and criminal justice systems are based upon accountability, empathy, and remorse. In the instant case, appellant, through the advise [sic] of his lawyer, has chosen not to speak or address the court at any hearing. While I respect the fact that appellant continues to have a privilege against self-incrimination, it [is] my obligation, however, to attempt to engage him about his treatment goals in order to ascertain whether "he gets it" and to determine

whether there is a risk to the community, or more specifically to this victim, if he is discharged.

Juvenile Court Opinion, 6/21/11, at 28–29.

Initially, we emphasize that Appellant's constitutional claim was raised during the post-dispositional phase of a juvenile proceeding. *Brown* is clearly distinguishable on that basis because the constitutional claim therein was raised during the decertification phase. Furthermore, we discern no merit to Appellant's argument that the juvenile court "imposed conditions and requirements primarily on the basis that the child has not expressed remorse or apologized." Appellant's Brief at 76. The record supports the juvenile court's balanced consideration of Appellant's treatment goals, S.D.'s need for protection, and the most feasible means to achieve both of those ends. The juvenile court agreed to Appellant's release because the evidence indicated Appellant excelled in completing his treatment goals to the fullest extent possible through the programs provided in secured placement, even though he could not, would not, did not "come forward and take responsibility for his actions." *Brown*, 26 A.3d at 498. However, given the unique circumstances of Appellant's memory loss and silence, the juvenile court imposed probation to provide additional time and support for ensuring Appellant's rehabilitation. Additionally, because Appellant's home is about two miles from S.D.'s home, the juvenile court imposed electronic home monitoring and a respite plan for the sake of S.D.'s safety.

Considering the juvenile court's thoughtful disposition, we do not agree with Appellant that the juvenile court seeks a confession from Appellant in order to release him from electronic monitoring and the supervision of the probation department and court. Rather, we recognize the juvenile court's patient efforts to determine within the confines of Appellant's memory loss and silence, as well as S.D.'s fears and proximity, whether Appellant has achieved the treatment goals of community protection, victim awareness and accountability, and competency development. We, thus, conclude the juvenile court has complied with the relevant purposes of the Juvenile Act by allowing Appellant to continue his rehabilitation in a family environment, while providing for S.D.'s safety. 42 Pa. C.S.A. § 6301(b)(2), (3).

In his final issue, Appellant alleges that the cumulative effect of the juvenile court's alleged errors and defense counsel's alleged ineffectiveness were prejudicial. In response, the Commonwealth argues that, if Appellant's individual claims of error are meritless, then his claim of cumulative impact is also meritless. We agree with the Commonwealth.

Our Supreme Court has explained the concept of cumulative error:

> To the degree that [appellant's] claims failed on merit or arguable merit, there is no basis for an accumulation claim. To the extent that individual dispositions have centered on the absence of sufficient prejudice to give rise to relief on an individual basis, we are also satisfied that prejudice would be lacking on a collective basis relative to those claims as well.

*Commonwealth v. Sattazahn*, 597 Pa. 648, 699–700, 952 A.2d 640, 670–71 (2008), *cert. denied sub nom. Sattazahn v. Pennsylvania*, —— U.S. ——, 129 S.Ct. 2765, 174 L.Ed.2d 273 (2009). We have concluded in the foregoing discussions of Appellant's issues that the juvenile court did not err and that defense counsel was not ineffective. Accordingly, Appellant is not entitled to relief on his final claim either.

Petition to discontinue appeals at 787 WDA 2011 and 788 WDA 2011 granted. Dispositional order affirmed.