J-A16032-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CESAR OBDULIO RODRIGUEZ AREVALO | : | |
| | : | No. 96 MDA 2019 |
| Appellant | : | |

Appeal from the Judgment of Sentence Entered December 19, 2018
In the Court of Common Pleas of Franklin County Criminal Division at
No(s):  CP-28-CR-0000167-2018


BEFORE:   LAZARUS, J., MURRAY, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED JULY 31, 2019**

Appellant, Cesar Obdulio Rodriguez Arevalo, appeals from the judgment of sentence entered in the Court of Common Pleas of Franklin County after a jury found him guilty of two counts of criminal attempt to commit involuntary deviate sexual intercourse and one count each of indecent assault by forcible compulsion, indecent exposure, and criminal attempt to commit rape. Sentenced to 117 to 540 months' incarceration, Appellant challenges the trial court's evidentiary ruling admitting testimony over his hearsay objection, and he contends the evidence was insufficient to support his convictions.  We affirm.

Appellant's criminal charges stemmed from an accusation that he had sexually assaulted another man in the locker room of a local gym on the morning of January 2, 2018.  At trial, the Commonwealth presented the

_____
\*   Former Justice specially assigned to the Superior Court.

testimony of the victim, Z., a 29 year-old male on the Asperger's spectrum, and the victim's mother, D. ("Mother").

As the first witness called, Mother testified to Z.'s cognitive and social challenges associated with his Asperger's, which include severe anxiety and ADHD, although she described him as being "on the high [functioning] side of his disability." N.T. 11/8/18, at 29. Mother continued, "[Z.] is a very black-and-white person. There's no gray area for him. So when [fellow students in school] didn't act right, it would upset him. . . . And he has a very strong will to please. He wants to do good. N.T. at 28.

Z. lives with his parents, Mother testified, and "[h]e works for people we know only because [he] can only do jobs as tolerated. So we've kept him pretty protected. He works basically—he's an apprentice for my husband at the gun shop. He's learned to do a lot of things that has become [sic] an asset to my house." N.T. at 31.

Mother also described how a contractor working on their home offered to hire Z. as an apprentice when he saw how Z. helped around the house. The arrangement failed, however, because Z. frequently became anxious and could not stay sufficiently focused to complete his tasks. N.T. at 31.

Mother's testimony turned, then, to the aftermath of the alleged sexual assault. After confirming that Z. routinely went to the gym in the mornings before work, Mother related how one evening she discovered Z. in their finished basement crying alone in the dark. N.T. at 33-34. His hands were shaking and he was "very, very emotionally upset," Mother said, and it took

some time for her to calm him enough so that he could explain what was wrong.  N.T. at 34-35.

Pursuant to the trial court's ruling prohibiting Mother from telling the jury what Z. said to her specifically, Mother indicated generally that Z. said someone had physically harmed him at the gym two days earlier.  N.T. at 36-37, 40.  It was Mother and Father's decision, therefore, to inform the gym and the police about the incident the following morning.  N.T. at 38.

At this time during Mother's testimony, the Commonwealth asked Mother if she helped Z. prepare a written statement describing the alleged assault.  She answered that she wrote it because "[Z.] cannot express himself on paper very well.  And we help him a lot with that.  That's part of his disorder." N.T. at 39.  She continued, "I wrote it as a draft first, had [Z.] read it because he can read that.  I said, [']Is what I said what you want me to say?['] He said, [']Yeah, mom, that's what I want to say.['] The statement was admitted into evidence as Commonwealth Exhibit No. 1.  N.T. at 38.

On cross-examination, Mother confirmed that Z. graduated from high school, where he participated in track and cross-country, works 40 hours per week at his father's shop, and is strong enough to help with his father's other business, which requires heavy lifting.  N.T. at 41-43.

Regarding the written statement, defense counsel asked Mother if she coached Z. what to say, and she responded, "Well, I wrote what I thought he would want to say and left [sic] him read it.  And he said [']yes.['] N.T. at 44-45.

- 3 -

On redirect examination, the Commonwealth developed the issue of "coaching" further, with the following line of questioning:

> **COMMONWEALTH:** In the written statement there, are those words—tell us how that came about. Did he tell you what to say? Did you tell him what to say? I don't understand?
>
> **MOTHER:** [Z.] told me what he told me. And from what he told me, I derived these words.
>
> **COMMONWEALTH:** Now, at any point in time during the interview—interview—when you were talking to your son, did you suggest anything that may have happened at the gym at all?
>
> **MOTHER:** Yes.
>
> **COMMONWEALTH:** Okay. Give me an example of what you might have said or did.
>
> **MOTHER:** Wait a minute. Can you—
>
> **COMMONWEALTH:** Sure. In other words, when you were asked—talking to him, did you tell him what happened or was he telling you what happened?
>
> **MOTHER:** He was telling me what happened.
>
> . . .
>
> **COMMONWEALTH:** At the time that [Z.] was telling you what was going on, was it a clear narrative? Did you understand everything? Or still trying to piece it together over the next few days?
>
> **MOTHER:** It was very clear.

N.T. at 46, 48.

Next, Z. took the stand and provided a detailed accusation of how Appellant sexually assaulted him at the gym on the morning of January 2, 2018. Pertinent excerpts of his testimony include the following:

**COMMONWEALTH:** When you were done with your workout, did you go to the locker room?

**Z.:** Yes.

**Q:** And what happened?

**A:** Basically, what happened was I walked in. And there was nobody in there. All of a sudden for some reason, something happened to me. I was attacked by a certain individual. And he had no clothes on, bare naked wearing flip-flops. I was sitting on the one bench to the left. And he was on my side to the right.

And he proceeded to come toward me, touched my left leg and said, 'You got nice thighs' and mentioned my groin. He proceeded to pull me up off the chair, grabs ahold of my right arm and said, I do this for pleasure.

I pulled away from him the first time. He got me ahold [sic] the second time. I tried to scream for [the gym owner]. Nobody couldn't [sic] hear me because music was playing in the locker room.

**Q:** I need you to slow down just a little bit. Go ahead.

**A:** I was in the locker room. I apologize. I went in the locker room. I saw the individual not wearing any clothes. And he came around the corner. He was naked completely, not wearing anything, no underwear, no socks, nothing.

And he proceeded to go to his locker on the other side of the bench to my right. And he proceeded to touch my left leg, says, 'You have nice thighs and you have nice balls.' He said that.

Then he pulls me up. I pulled away from him the first time. And he—I got away from him. The second time he grabbed ahold of me, keeps pulling me toward him. He said, I do this for pleasure.

- 5 -

I said, 'I don't like men. I'm not interested in this kind of stuff.' I was trying to yell for [the gym owner]. Nobody couldn't [sic] hear me. He takes me around the corner where the handicap bathroom was. He comes down on me and gives me a blow job. I couldn't do anything about that.

So then after that was all over, he starts to bend me over and sticks his thing up my anal so far I couldn't move. So I tried to get back. I said, 'Ouch, ouch, ouch,' because it was hurting.

So I went and sat on the handicap toilet seat. He sits on my lap. He said—I don't mean to be perverted. He said, 'Do you want to fuck me?' I said, 'no.' I put my hand on his chest. I said, 'No means no.'

So then, after that, he got up. He jerked off. And sperm went all over the floor. He went out the door. I went out behind him. He come up to me, shook my hand. I was not happy that day.

It took me at least three days to tell my mom and dad what happened because I was in so much pain. I didn't even know who I was. I didn't know my name. I didn't know who—I was feeling like—I felt like I was useless because I felt so heartbroken by this terrible act that was committed against me. And I didn't ask for it to happen.

N.T. at 62-64.

The Commonwealth asked specific follow-up questions that not only enabled Z. to augment the details of the events he had described, but also led to answers lending insight into how his Asperger's may have impaired his ability to understand, and defend himself against, the unwanted advances. For example, to the question asking whether Appellant asked Z. about his genitalia, Z. answered, "Yeah. He asked me if I've been circumcised. I could not answer that question because it grossed me out." N.T. at 74.

When asked why he did not simply walk out of the locker room in response to Appellant's overtures, Z. testified, "I was over toward that way.

But he came at me a second time. I had no way to get out. He grabbed ahold of me the second time, it was too late." N.T. at 74-75. As for why he did not exit the bathroom stall, he replied, "I was trying to get out of the bathroom. He went to block the middle of it. I couldn't get out. There was no way to get away." N.T. at 75.

While describing Appellant's initial act of oral sex in the bathroom, Z. said, "I didn't like it. I was not satisfied with it. And I was so upset with it. It took everything in me to restrain myself, not to do anything wrong." N.T. at 75-76. Asked why he did not strike Appellant at the time, Z. said, "It wouldn't be worth going to jail over somebody like that because it's not worth that in my mind." N.T. at 76.

Finally, Z. again used words of helplessness and resignation when describing Appellant's attempt to subject him to anal sex: "He just pushed me from behind. I had a hand on the wall like this. I had a hand on the trashcan. He had me bent over. I couldn't move. So at that time, it was too late." N.T. at 77. In a similar way, Z. testified that he gave up calling for help early on because "Nobody couldn't [sic] hear me. [Appellant] kept trying to shush me. Shush, shush, shush, trying to keep me quiet from telling anybody." N.T. at 79.

After Z. completed his account of the alleged assault, the Commonwealth asked him about the written statement his mother prepared and submitted to police. Z. indicated the statement derived from what he had told his mother, N.T. at 87, and he read the statement for the jury:

**Z.** On Tuesday, January 2nd, 2018, I was sexually assaulted in [the gym's] men's locker room by another member and reported this to the gym today on January 5th as it took me a while to tell anyone. He was touching me, nipping at me, and keeping me from telling him no. He continued not to listen. He tried to come on to me before the rear end. I [began] to talk loud. He tried to shush me and went on pleasing himself.

N.T. at 87.

On cross-examination, defense counsel elicited testimony confirming that Z. was a young, strong man standing 6'3" tall, while Appellant was also young and fit, but only about 5'2". Counsel asked, "So all five two of him had dragged all six three of you. You couldn't stop that?" Appellant replied, "No, I couldn't. I tried to. But I had no way of getting away from him at that time." N.T. at 94. In the series of cross-examination questions and answers, Z. repeated his narrative consistently with his prior testimony. N.T. at 90-97.

After Appellant's conviction and sentencing, as noted supra, he filed the present timely appeal. He raises two questions for our consideration:

1. [Did] the trial court [err] in allowing into evidence the hearsay statements of victim's mother regarding what the victim told her in relation to the events leading to the charge?

2. [Was] the evidence . . . sufficient to support [each conviction]?

Appellant's brief, at 3.

Appellant's first issue centers on the trial court's ruling regarding the admission into evidence of what he asserts was "Mother's hearsay testimony" "recounting the victim's statements to [the] jury." Appellant's brief, at 9. "An appellate court's standard of review of a trial court's evidentiary rulings,

including rulings on the admission of hearsay ... is abuse of discretion." ***Commonwealth v. Walter***, 93 A.3d 442, 449 (Pa. 2014). Thus, we will not disturb an evidentiary ruling unless "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by evidence of record." ***Commonwealth v. Cooper***, 941 A.2d 655, 667 (Pa. 2007) (citation omitted). To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." ***Commonwealth v. Lopez***, 57 A.3d 74, 81 (Pa.Super.2012) (quoting ***McManamon v. Washko***, 906 A.2d 1259, 1268–1269 (Pa.Super.2006)).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ***Commonwealth v. Dent***, 837 A.2d 571, 577 (Pa.Super. 2003); Pa.R.E. 801(c). Notably, Appellant identifies neither the statements constituting inadmissible hearsay nor where in the record we may find them. Nevertheless, we elect to conduct merits review notwithstanding the deficiencies in Appellant's argument, and in so doing we find the record belies Appellant's claim that the court admitted hearsay testimony over his objection.

During Mother's testimony, the trial court took great care to prevent Mother from making hearsay statements, and Mother adhered to the court's rulings throughout her testimony. ***See*** N.T. 34-41, 45-50. Specifically, Mother's testimony related both how she encountered Z. in the basement and

- 9 -

what Z.'s emotional and physical state was at that time. *Id*. As Mother began to say, "He told me that—he told me that—he said 'Mom'--", the court sustained Appellant's hearsay objection before Mother shared what Z. said. N.T. at 34.

After the court's ruling, the Commonwealth often prefaced its questions to Mother with a reminder that she not use Z.'s words, and Mother complied by relating only her general observations that Z. was very descriptive in his account, gave the location of his alleged assault, tried to describe the assailant, and did say whether he was physically harmed. N.T. at 36. Appellant raised a hearsay objection at the end of this exchange, which the court overruled. *Id*.

As discussed, *supra*, Mother confirmed she had also prepared a written statement based on the account Z. had shared with her. N.T. at 38-39. When Mother testified that Z. remarked the statement said what he wanted it to say and thanked her, the court sustained Appellant's hearsay objection. *Id*. As with every other instance in which the court sustained Appellant's objection, he did not ask for a cautionary instruction, make a motion for mistrial, or seek any other remedy.

The record thus establishes that the trial court sustained all of Appellant's hearsay objections except for one, and yet at no time did Appellant move for mistrial, ask for a cautionary instruction, or complain in any way that the admission of testimony deemed inadmissible prejudiced his ability to receive a fair trial. His failure to request any remedy with the trial court,

therefore, results in waiver of his claim requesting such a remedy on appeal. *Cf. Commonwealth v. McGeth*, 622 A.2d 940, 943 (Pa.Super. 1993) (holding when objection is sustained, which indicates court agrees challenged conduct was improper, failure to request curative instruction or mistrial immediately results in waiver of right to make such request on appeal). *See also Commonwealth v. Manley*, 985 A.2d 256, 267 n. 8 (Pa.Super. 2009) (collecting cases).

With respect to the one instance in which the court overruled Appellant's hearsay objection, we discern no error with the court's ruling. Mother's testimony confirmed only that Z.'s communication to her in the basement addressed matters such as where the event happened, what the assailant looked like, and whether Z. experienced physical harm, without supplying substantive assertions or allegations about any of those matters. As such, this testimony was offered not to prove the truth of the matters asserted therein but only to provide the jury with the factual background needed to understand how Z.'s allegations came to light and how Mother gained information to write her statement.

As for the written statement, which the jury heard for the first time when Z. read it during his testimony, N.T. at 87, Appellant does not expressly identify it as part of "Mother's hearsay testimony" he assails on appeal. Furthermore, he fails to indicate whether he objected to the admission of the statement and, if so, where in the record we may find such objection.

Appellate briefs must conform in all material respects to the briefing requirements set forth in the Pennsylvania Rules of Appellate Procedure. Pa.R.A.P. 2101. **See also** Pa.R.A.P. 2114-2119 (addressing specific requirements of each subsection of brief on appeal). Regarding the argument section of an appellate brief, Rule 2119(a) provides:

> **Rule 2119. Argument**
>
> **(a) General rule.**—The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.

Pa.R.A.P. 2119(a).

This Court has expounded on the requirements of Rule 2119:

> "[I]t is an appellant's duty to present arguments that are sufficiently developed for our review. The brief must support the claims with pertinent discussion, with references to the record and with citations to legal authorities." **Commonwealth v. Hardy**, 918 A.2d 766, 771 (Pa.Super. 2007), *appeal denied,* 596 Pa. 703, 940 A.2d 362 (2008) (internal citations omitted). "This Court will not act as counsel and will not develop arguments on behalf of an appellant." **Id.** If a deficient brief hinders this Court's ability to address any issue on review, we shall consider the issue waived. **Commonwealth v. Gould,** 912 A.2d 869, 873 (Pa.Super. 2006) (holding appellant waived issue on appeal where he failed to support claim with relevant citations to case law and record). **See also In re R.D.**, 44 A.3d 657 (Pa.Super. 2012), *appeal denied*, 618 Pa. 677, 56 A.3d 398 (2012) (holding appellant waived issue, where argument portion of appellant's brief lacked meaningful discussion of, or citation to, relevant legal authority regarding issue generally or specifically; appellant's lack of analysis precluded meaningful appellate review).

**Commonwealth v. Adams-Smith**, ---A.3d----, 2019 PA Super 151, at *3 (filed May 7, 2019).

In light of this jurisprudence, we conclude that our inability to discern whether Appellant directs any part of his hearsay challenge to the written statement requires us to find any such argument waived.[1]

In Appellant's remaining issue, he ostensibly claims to challenge the sufficiency of evidence offered to prove each charge against him. Appellant

---

[1] Even if we were to find Appellant adequately preserved and briefed a hearsay challenge to the written statement, we would conclude that its admission was, at worst, harmless error.

> The Commonwealth bears the burden of establishing the harmlessness of the error. It must show at least one of the following:
>
> (1) The error did not prejudice the defendant or the prejudice was *de minimis* or;
> (2) The erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence or;
> (3) The properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial [e]ffect of the error so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Fitzpatrick*, 204 A.3d 527, 533 (Pa.Super. 2019) (quotation marks and citation omitted).

A review of the record reveals that Mother's vague and inexplicit statement pales in comparison to the specific and detailed testimony of Z., who compellingly recounted Appellant's assault on him in a consistent and comprehensive manner.

Therefore, assuming, arguendo, that the written statement constituted inadmissible hearsay, its admission was utterly harmless given its cumulative nature and inferior quality relative to Z.'s probative testimony, which amply established Appellant's guilt. *See id.* (deeming erroneous admission of victim's email harmless given overwhelming evidence of defendant's guilt supplied by properly admitted evidence).

effectively admits, however, that his sufficiency argument is meritless where he states, "On its face, it appears that if the fact finder believes the testimony of the victim, then the evidence is unequivocally sufficient. However, if that were the case, there could be no challenges to the weight or sufficiency of the evidence." Appellant's brief, at 13. He does not develop this idea further.

The remainder of Appellant's argument consists of what is actually a weight of the evidence argument, in which he asserts only, "The victim is simply too big and strong for the events to have happened as he testified." *Id*. This Court has explained:

> The law is well settled that a sufficiency argument that is founded upon a mere disagreement with the credibility determinations made by the fact finder, or discrepancies in the accounts of the witnesses, does not warrant the grant of appellate relief, for [i]t is within the province of the fact finder to determine the weight to be accorded each witness's testimony and to believe all, part, or none of the evidence introduced at trial.

**Commonwealth v. Johnson**, 910 A.2d 60, 65 (Pa.Super. 2006) (quotation marks and citations omitted).

Under **Johnson**, Appellant may obtain no relief for what he denotes as a sufficiency argument. To the extent Appellant's argument is more accurately described as directed to the weight of the evidence, he has not preserved this issue. **See** Pa.R.Crim.P. 607; **Commonwealth v. Thompson**, 93 A.3d 478, 490 (Pa. Super. 2014) (stating that "[a] weight of the evidence claim must be preserved either in a post-sentence motion, by a written motion before sentencing, or orally prior to sentencing.").

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>7/31/2019</u>