J-S30023-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.N.A, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.N.A., A MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 939 EDA 2023 |

Appeal from the Order Entered March 10, 2023
In the Court of Common Pleas of Monroe County Criminal Division at
No(s):  CP-45-JV-0000026-2023

BEFORE:  BENDER, P.J.E., LAZARUS, J., and SULLIVAN, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED NOVEMBER 7, 2023**

T.N.A., a fifteen-year-old minor, appeals[1] from the disposition order entered in the Court of Common Pleas of Monroe County, placing her in an out-of-home detention facility.  T.N.A. argues the juvenile court abused its discretion, claiming that, based on the expert testimony of psychiatrist Dr. Andrew Clark, family testimony, and the availability of community-based treatment, this was not the least restrictive treatment available.  After our review, we affirm based on the trial court opinion authored by the Honorable David J. Williamson.

T.N.A. was adjudicated delinquent on charges of aggravated assault, criminal mischief, simple assault, resisting arrest, disorderly conduct, and

---

[1] The docket indicates that a dispositional order, dated March 10, 2023, was entered on March 14, 2023.  On March 15, 2023, the court entered an amended dispositional hearing order.  This appeal, taken from the March 10, 2023 order, was timely filed on April 5, 2023.  *See* Pa.R.A.P. 903(a); 905(5).

harassment as a result of an incident in February 2023. At that time, T.N.A. was on probation for an incident at Pocono Mountain West High School, during which she had threatened school personnel, made homicidal threats regarding her parents, physically assaulted the dean of students, and had to be restrained by police. T.N.A. was found in violation of probation as a result of the new charges.

Following an adjudicatory/disposition hearing, the court determined T.N.A. was in need of treatment and ordered placement at North Central Secure Treatment Unit, stating it was "the least restrictive type of placement that is consistent with the protection of the public and best suited to [T.N.A.'s] treatment, supervision, rehabilitation, and welfare." *See* Adjudicatory/Disposition Hearing Order, 3/10/23.[2]

T.N.A. raises one issue on appeal:

Is it an abuse of discretion when the trial court, based solely upon the Juvenile Probation Department's recommendation, removed [T.N.A.] from her home, when T.N.A.'s mother, her family therapist, and an expert in adolescent behavioral psychology all

_____

[2] The court's order specified that T.N.A. "shall undergo psychiatric treatment and shall undergo a psychiatric evaluation and abide by any recommendations for treatment[,]" and that [t]his placement and [T.N.A.] shall be reviewed in accordance with the Juvenile Act." *Id.* Unlike the criminal justice system, in which a criminal defendant's judgment of sentence continues without further involvement by the trial court unless overturned on appeal, a juvenile's disposition "is subject to frequent, mandatory review by the hearing court." *In re M.D.*, 839 A.2d 1116, 1119 (Pa. Super. 2003). "[I]n the event a judge enters a disposition order that provides for commitment, the judge is **required** to review the propriety of that commitment every six months and must also hold a disposition hearing at least every nine months." *Id.* (citing 42 Pa.C.S.A. § 6353) (emphasis in original).

testified at her dispositional hearing that secure detention was not the least restrictive means available to meet T.N.A.'s needs?

Appellant's Brief, at 3.

We review "a juvenile court's dispositional order directing out-of-home placement for an abuse of discretion." *Interest of D.W.*, 220 A.3d 573, 576 (Pa. Super. 2019) (citation omitted). We will not disturb the disposition implemented by juvenile court absent a manifest abuse of discretion. *In re R.D.*, 44 A.3d 657, 681 (Pa. Super. 2012). "It is well settled that, under Pennsylvania law, an abuse of discretion occurs when the court has overridden or misapplied the law, when its judgment is manifestly unreasonable, or when there is insufficient evidence of record to support the court's findings." *Interest of D.W.*, 220 A.3d at 576 (internal brackets and citation omitted). Moreover, we note that, "in a juvenile proceeding, the hearing judge sits as the finder of fact. The weight to be assigned the testimony of the witnesses is within the exclusive province of the fact finder." *Id.* (citation omitted). *See also Interest of C.B.*, 241 A.3d 677, 681 (Pa. Super. 2020) (juvenile courts afforded broad discretion to craft appropriate disposition).

Section 6352 of the Juvenile Act sets forth six dispositional options for juveniles who have been adjudicated delinquent, including placement on supervision and commitment to a facility for delinquent children. *See* 42 Pa.C.S.A. § 6352(a). In choosing among these alternatives, a juvenile court must consider which dispositional alternative is

consistent with the protection of the public interest and best suited to the child's treatment, supervision, rehabilitation and welfare,

which disposition shall, as appropriate to the individual circumstances of the child's case, provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable the child to become a responsible and productive member of the community[.]

*Id.* Further, when a disposition involves an out-of-home placement, the juvenile court must explain on the record why such commitment is "the least restrictive placement that is consistent with the protection of the public and best suited to the child's treatment, supervision, rehabilitation and welfare." 42 Pa.C.S.A. § 6352(c). *See also* 42 Pa.C.S.A. § 6301(b)(3)(i) (disposition "separating the child from parents only when necessary for his welfare, safety or health or in the interests of public safety, by doing all of the following: (i) employing evidence-based practices whenever possible and, in the case of a delinquent child, by using the least restrictive intervention that is consistent with the protection of the community, the imposition of accountability for offenses committed and the rehabilitation, supervision and treatment needs of the child").

Here, the court heard testimony from T.N.A.'s mother, T.N.A.'s family therapist, T.N.A.'s probation officer, Patrol Officer Austin Price, and Dr. Andrew Clark, psychiatrist and section chief of the adolescent behavioral health unit at St. Luke's Hospital, who had treated T.N.A. for two inpatient admissions on November 3, 2022, and on February 9, 2023. After consideration of the testimony from the adjudicatory and dispositional hearings, the juvenile court concluded that community-based treatment and

placement with her parents was "less than what is necessary at this time." Trial Court Opinion, 4/12/23, at 12. *See also id.* at 10-11 (noting T.N.A.'s lack of self-awareness and remorse, stating "[w]hether her actions are due to prior trauma and dissociative rage or some other mental health condition, or simply reactive behavioral issues, [T.N.A.] needs more help than what has been provided in the community[,]" and disagreeing with recommendations of "more of the same").

We defer to the juvenile court's credibility determinations, *D.W.*, *supra*, and conclude that the court's findings are well-supported by the record. We find no manifest abuse of discretion. *R.D.*, *supra*. Accordingly, we affirm the court's order based on Judge Williamson's opinion. We direct the parties to attach a copy of that opinion in the event of further proceedings.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/7/2023

1_Statement Pursuant to PA R.A.B. 1925(a).pdf

**COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA
JUVENILE COURT DIVISION**

IN THE INTEREST OF        : **NO. 26 JUVENILE 2023**

                       :

   T    N     A     ,    :

   A Minor                 :

                       : **PA.R.A.P. 1925(a)**

<u>**STATEMENT PURSUANT TO PA. R.A.P. 1925(a)**</u>

The Juvenile having filed a Concise Statement of Matters Complained of on Appeal with the Notice of Appeal filed April 5, 2023, regarding disposition in a juvenile delinquency proceeding, this opinion follows:

The Juvenile in this matter, T   N   A   ("Juvenile") was the subject of an adjudication hearing held on March 10, 2023. The Juvenile is a 15 year old female (DOB 2/  /08) who was charged with two (2) counts of Aggravated Assault (F2), one (1) count of Criminal Mischief (F3), two (2) counts of Simple Assault (M2), one (1) count of Resisting Arrest (M2), one (1) count of Disorderly Conduct (M3), and two (2) counts of Harassment (S) for an incident that occurred in early February 2023.

At the time of this incident, the Juvenile was already on probation due to an August 30, 2022 incident at the Pocono Mountain West High School in which the Juvenile became combative with school staff and the school Resource Officer (case #157 JUV. 2022). At that time, the Juvenile had made threats to school personnel that she wanted to kill her

parents. She then physically assaulted Dr. Morrell, the Dean of Students, and Officer Wile, the school Resource Officer, who tried to talk to her and calm her down. The Juvenile continued to assault additional staff and police officers called to the scene. She was eventually secured in handcuffs and placed in the back of a police vehicle. The Juvenile slipped her hands out of the handcuffs and then she attempted to flee when Officer Wile opened the vehicle door to secure the Juvenile. The Juvenile then began kicking the door and windows of the police vehicle. She did not stop until an officer sprayed her with "OC" (mace/pepper spray) and EMS arrived on the scene. The Juvenile eventually entered an admission to simple assault in that matter and was placed on probation for a minimum period of one year and ordered to attend the PATH day treatment program full-time and to engage in individual and family counselling. The YLS Assessment Summary compiled by the Monroe County Juvenile Probation Department for that incident totaled 17, or at the high end of the moderate range to re-offend.

Due to the new charges in this case, the Juvenile was scheduled for an adjudication hearing on the new charges and for a probation violation hearing on the prior case (#157 Juv. 2022) to be heard together on February 27, 2023. At the time of the February 27, 2023 hearing, the adjudication hearing in the current case was continued at the request of counsel and re-scheduled to March 10, 2023. Following a brief hearing on February 27, 2023 on the probation violation, the Juvenile was found to be in violation of the terms of her probation due to the new charges in this case, threats of harm to her parents that the Juvenile made to her Probation Officer, Brian Holley, and for leaving her house without permission.[1] A

---

[1] Although one of the Juvenile's parents reported to Officer Holley that the Juvenile had eloped from the home without permission on the day in question, the Juvenile's parents then claimed one of them gave her permission to leave for a period of time to cool down. We did not find that testimony credible.

re-disposition as a result of the probation violation was deferred pending a final adjudication hearing in this matter. *See* #157 JUV. 2022.

At the adjudication hearing in this matter, held on March 10, 2023, Officer Price of the Pocono Mountain Regional Police Department testified that he and another officer were dispatched because the Juvenile had left her home in Pocono Country Place ("PCP), her therapist thought she might be suicidal, and she had run away from PCP Security when they approached her. Officer Price then encountered the Juvenile walking along State Route 196, a major state road with no sidewalks and minimal shoulder area in a rural part of Monroe County. Officer Price pulled over and got out of his vehicle to talk to the Juvenile. He then tried to get her to walk back to the police vehicle, at which time the Juvenile started crying and flailing her arms. Officer Price ultimately had to carry the Juvenile to the car and put her in the back seat.

Officer Price then tried to explain to the Juvenile that he was responding to a mental health crisis call about her and that her parents were worried she might be suicidal. The Juvenile denied she was suicidal, but said that she was homicidal, and if returned home to her parents she would kill them. The officer tried to convince the Juvenile to either go home with him to her parents or to the hospital, but she refused. The Juvenile stated she wanted to continue walking on Route 196 to her cousins' house in Pocono Farms, which was quite a distance away. The officer told her that she was reported as missing and had to go home for her own safety. The officer testified the Juvenile was calm at that point, so he closed the door, got in the vehicle, and started to drive the Juvenile to her home.

During the drive, the Juvenile started to try to bend the camera in the rear seat down in some manner. Officer Price became concerned because he was aware of the prior incident at the Pocono Mountain West High School with the Juvenile in August 2022 when she attempted to strangle herself with the seatbelt in the back seat of a patrol car at one point. Concerned the Juvenile would somehow hurt herself, the officer pulled over to stop in order to secure the Juvenile safely. By that time, the Juvenile was also trying more aggressively to destroy the camera, including pulling the wires out of it.

The Juvenile then fought with the officer as he tried to calm her down. Officer Price decided to handcuff the Juvenile at that point, and he and another responding officer got her out of the police vehicle to do so. The Juvenile then dropped to dead weight as the officers held her. She then started to bite, kick and scream. The officers managed to get handcuffs on the Juvenile and place her in the back of the vehicle again. The Juvenile then proceeded to slip out of the handcuffs, laughed at the officers, and twirled the handcuffs in her hands and said "Try to do better." The Juvenile then started hitting the plastic divider in the back seat with the handcuffs before throwing them out of the partially opened rear window.

The Juvenile then started to bite and tear the cloth to the seat and ceiling, while continuing to try to pull out exposed wires. Officer Price again attempted to get the Juvenile under control. She then kicked the officer in the chest. EMS was called to the scene and the Juvenile had to be held down until she could be loaded on an ambulance and transported to the hospital. She continued to try to hit and bite the first responders until she was restrained. The Juvenile was eventually sedated at the hospital. Officer Price testified that the Juvenile's

4

behavior, while out of control, did not appear to be a temper tantrum like that of a toddler. The officer's testimony was credible and convincing.

Dr. Andrew Clark of St. Luke's Hospital, testified on behalf of the Juvenile. Dr. Clark is a psychiatrist in the child adolescent behavioral services department of St. Luke's, where the Juvenile was ultimately transported. Dr. Clark stated that the Juvenile had a prior diagnosis of depressive disorder and ADHD. Dr. Clark was aware of prior trauma the Juvenile suffered that he said results in a "fight or flight" reaction at times. He called the Juvenile's actions on the day in question the result of a dissociative blackout trauma state. Dr. Clark doubted the Juvenile had the ability to control herself, although he was uncertain when she entered that state of mind that day. He testified that her mindset was a dissociative rage. Dr. Clark stated that the officer's description of what happened made it apparent that the Juvenile was clearly psychotic at the time. However, he stated she may have had some decision making instances throughout the event, but could not state when. Dr. Clark feels the Juvenile can safely be in the community, but agreed she should not be able to walk-out of her home without permission like that again. Dr. Clark then stated that the Juvenile does not have a specific psychotic diagnosis, that he believes she may have oppositional defiant disorder, and her reaction in this case was more of a dissociative rage in a regressed manner due to the Juvenile's age and maturity level. Dr. Clark has not seen the Juvenile since her release following the hospital admission of February 9, 2023 in this matter.

We ultimately found some of Dr. Clark's testimony compelling and convincing, but not as to all of the behaviors exhibited by the Juvenile on the date of this incident. As a

5

result, the Juvenile was found delinquent as to criminal mischief (as a summary offense),[2] Resisting Arrest (M2), and Disorderly Conduct (M3). We stated those reasons on the record at time of the adjudication hearing and incorporate them herein. An immediate disposition was then held on March 10, 2023. The Probation Officer confirmed a placement was available at North Central Secure. The Commonwealth and the Probation Officer recommended placement due to behavioral concerns, the threats conveyed by the Juvenile prior to this incident and again on the day of this incident to the Probation Officer and to the police that she would kill her parents, and the need for in-depth psychiatric evaluation and treatment. The Court also heard from the Juvenile's community therapist from Merakey and the Juvenile's mother. The disposition entered in this matter was placement of the Juvenile at the North Central Secure residential program with a bed available the following week.

The therapist from Merakey confirmed at disposition that the Juvenile is scheduled to attend the PATH day treatment program three days per week, and that the Juvenile meets with the Merakey therapist two days per week. The Juvenile was recently approved for another thirty-two (32) weeks of therapy with Merakey. The counselling with Merakey and the PATH program have been involved with the Juvenile at least since her placement on probation in case #157 JUV. 2022. The Juvenile sees the Merakey therapist individually one day per week, and together with her parents one day per week. The Merakey therapist is working on issues of anxiety, depression and anger management. The therapist confirmed that on the day of the incident the Juvenile's Probation Officer made Merakey aware the Juvenile had made

---

[2] Criminal Mischief was charged as an (F3) for damage to the inside of the police vehicle. We initially found the grading was an M3, because there were at least $500 in damages. However, we dropped this to a summary offense in the written Adjudication Order as we realized there were damages, but no testimony as to an amount of those damages was given at the adjudication hearing.

6

threats to kill her parents. The Probation Officer and one of the Juvenile's parents also made the therapist aware the Juvenile left the home that day. The Merakey therapist was actually on her way to the home for a therapy session at the time of the Juvenile leaving her home. The therapist saw the Juvenile walking on the road that day and tried to engage her, but she would not do so. This interaction was just prior to the police involvement, who the therapist had called.

The Juvenile's mother testified the Juvenile has an IEP in school, that she takes Trazadone to sleep, Zoloft for depression, and something else for anxiety. Dr. Clark thought she was on Concerta for ADHD, too. The Juvenile's mother could not remember the name of the Juvenile's psychiatrist who prescribes the medications. She also stated that the Juvenile does not see the psychiatrist in person; rather, it is one time per month over the phone. It did not appear the Juvenile had a full psychiatric or psychological evaluation, outside of her IEP and recent admission to St. Luke's behavioral unit.

The Juvenile raised three issues in her concise matters complained of on appeal. The first is that the out-of-home secure placement does not preserve the family unit where the Juvenile's parents were willing to have the Juvenile in the home. The second was that the placement disregarded the testimony of Dr. Clark in that it was not the least restrictive placement. Third, that the placement did not provide balanced attention to protection of the community, accountability, and development of competencies to assist the Juvenile.

This court considered the balanced and restorative justice initiatives in the Juvenile's disposition. It is noted that the Juvenile was already on probation at the time of the incident for a nearly identical outburst in school six months earlier. For that incident (#157

7

JUV. 2022), the Juvenile was given an opportunity to work through issues while in the community. She was also given a chance to be accountable for her actions in the community by abiding by rules established by the Probation Department and supervised by the court. The Juvenile's Probation Officer is school based and met with her on a regular basis. The Juvenile was given a curfew and strict instructions to follow the rules of her parents. Individual and family counselling were required and instituted for the Juvenile. She was also required to attend the PATH treatment program on a full-time basis. In other words, the Juvenile was given an opportunity to address her issues in the community and to be held accountable with supervision and support.

Unfortunately, the community-based approach did not work. The services available in the community were not enough to prevent the current incident in which the Juvenile was physically assaultive to law enforcement officers who were trying to help her. Despite the counselling that was in place, the PATH program, regular meetings with her Probation Officer, and medications with psychiatric review, the Juvenile again made homicidal threats against her parents, absconded from the home, refused the assistance of her therapist who intervened, assaulted several police officers and EMS personnel, and damaged the inside of a police vehicle. One of two things is apparent from this incident; either the Juvenile did not learn from the first incident in August and her time on probation, or the services in the community are insufficient to treat the Juvenile and protect the public. In either instance, the Juvenile needs to be placed in a secure facility for the protection of the public, accountability, and for proper treatment.

As to protection of the public, this is the second incident in six months where the Juvenile physically assaulted various people she came into contact with who were trying to help her. In the first incident, it took being sprayed with mace/pepper spray to stop her behavior. In the current case, it took a sedative administered at the hospital. The Juvenile had stated in both incidents that she wanted to kill her parents. While the Juvenile's parents professed not to be afraid of these threats, the court cannot be so certain. At this time, without further diagnosis and treatment, we cannot state these threats are harmless. And, in addition to the threats, the Juvenile has assaulted various people and destroyed property. Even if these are completely to blame on the Juvenile's mental health dissociative rage, as identified by Dr. Clark, this repeat incident shows that what is available in the community is not working for the Juvenile. She has hit, kicked and bitten various people, she has damaged two police vehicles, and she continues to threaten to kill her parents. It would not be safe right now for her to continue to be in the community. It is further noted that the Juvenile likely would have been detained by law enforcement and Probation after both incidents had she not been transported to the hospital. Furthermore, she was not detained at the time of her Probation Violation hearing or immediately following disposition only because there were no detention beds available at the time.[3] North Central Secure did not have a bed available until the week following the adjudication and disposition hearings, so the court had to leave the Juvenile at home with her parents in the meantime.

The court also considered accountability in this placement. This was the second similar episode in six months, despite being placed on probation and meeting regularly with her

---

[3] This underscores the difficulty in securing detention beds for Monroe County juveniles who pose a danger to themselves or others. This appears to be a statewide problem without a current solution.

Probation Officer. The Juvenile left her home without permission (although the parents backed off this assertion, claiming one of them had given her permission to go for a walk to calm down), she again threatened to harm her parents when frustrated by them, and again disregarded law enforcement. The Juvenile slipped out of her handcuffs, just as she had in the August 2022 incident, and taunted the police officers. There were plenty of moments when the Juvenile's behavior appeared lucid at which time she refused to follow directions of adults, her therapist, her Probation Officer and police officers. Whatever mental health issues the Juvenile may have, it is clear that she has no respect for following rules or trying to reconcile her behavior and actions. Prior to becoming physically assaultive, the Juvenile was afforded the opportunity to talk with her therapist who found her in the community, or to go to the hospital with the police officer, but she refused.

We also note that the Juvenile showed little understanding of the impact of her behavior in any of the court hearings in this matter. We do not mean that she shouldn't contest the proceedings. The Juvenile has every right to do so. Rather, at time of the finding of the probation violation and again at disposition, the Juvenile did not apologize to anyone involved. She also did not convincingly say she would abide by all of her treatment recommendations and try to find a way for this behavior to not happen again. There seemed to be little self-awareness and remorse for what had happened. Placement in a full-time residential program is more appropriate at this point for purposes of the Juvenile's accountability than what she could get in the community.

The overriding concern of this Court at time of disposition was the need for services for the Juvenile. Whether her actions are due to prior trauma and dissociative rage or

some other mental health condition, or simply reactive behavioral issues, the Juvenile needs more help than what has been provided in the community. Instead, Dr. Clark and Merakey are recommending more of the same. It is apparent that what has been attempted in the community for the Juvenile is not working. Since the incident in August 2022 (#157 JUV. 2022), the Juvenile has had two (2) admissions to St. Luke's Hospital for behavioral health services on November 3, 2022 and February 9, 2023 (per Dr. Clark's testimony). She takes medication reviewed by a psychiatrist one time per month. She has been receiving counselling through PATH and Merakey. The Juvenile believes she would be best served by continuing this treatment. However, by all accounts, it did not work for this incident, despite Merakey being on scene at the time to essentially talk the Juvenile down from whatever made her threaten to kill her parents and to leave the home to "cool off." There was no testimony about what additional services could be provided to the Juvenile in the community, and from prior court experience, there really are none in Monroe County.

We also note that the Juvenile does not have a recent mental health evaluation or diagnosis. This can be obtained in placement. Dr. Clark stated he believes she may have oppositional defiant disorder, in addition to her earlier diagnosis of ADHD. He also noted she takes Zoloff for depression. He was concerned she had a psychotic episode of dissociative rage even though not previously diagnosed as being psychotic. The Juvenile's mother could not recall all of the names of the medications that the Juvenile took. She also could not remember the name of the psychiatrist the Juvenile sees in the community. The sessions with that psychiatrist are also once a month by telephone and not in person. It was alluded to by several witnesses that the Juvenile suffers from trauma associated with being sexually assaulted in the

11

past. However, it is unclear what is being done specifically to address that trauma. Merakey was approved for another thirty-two (32) weeks of therapy with the Juvenile. But, Merakey would not be able to provide a psychiatric or psychological evaluation. Such an evaluation would have to be provided by some other unidentified provider that the Juvenile would have to willingly participate in to be performed. The Merakey counselling, while sufficient in many cases, is simply not enough for the needs of the Juvenile at this time, some of which remain unknown. Treatment at a full-time residential placement can identify those needs, and start to work through them, especially the trauma the Juvenile has experienced in the past. The needs of the Juvenile are simply too much at this time to be met in the community.

While we agree that community-based treatment and placement with her parents is the least restrictive intervention, it is less than what is necessary at this time. We considered all of the testimony of all of the witnesses from the disposition hearing, and the adjudication hearing, finding some more credible and convincing than others, and rendered the decision that the best placement for the Juvenile at this time is in the North Central Secure facility and with the evaluations ordered. These and the findings on the record were our reason for the disposition entered.

BY THE COURT:

Date: April 12, 2023

DAVID J. WILLIAMSON, J.

cc:     District Attorney (LS)
        Public Defender (SB)

Clerk of Courts
APR 12 '23 PM 1:45

12