J-A01042-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| J.Y. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| S.S. AND I.R.-A., J.E., AND B.M.W. | : | |
| | : | |
| | : | No. 2168 EDA 2024 |
| APPEAL OF: B.M.W. | : | |
| | : | |
| | : | |

Appeal from the Order Entered July 24, 2024
In the Court of Common Pleas of Bucks County
Civil Division at No(s):  2021-60296

BEFORE:  DUBOW, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                **FILED MARCH 17, 2025**

B.M.W. ("Mother") appeals the July 24, 2024, final custody order that awarded primary physical custody and sole legal custody of her biological daughter, S.W., born in June 2020, to Guardians, S.S. and I.R.-A., (collectively, "Guardians").  After careful review, we affirm.

We take the relevant factual and procedural history of this case from the certified record.  Guardians, who are a married couple, are family friends of Mother who are primarily acquainted through the parents of I.R.-A.  *See* N.T., 7/17/24, at 85 (indicating Mother had a close relationship with I.R.-A's family).  I.R.-A was also named as S.W.'s godmother prior to assuming custody.  *See id*. at 6.

Mother admitted at the time that she became pregnant with S.W. in 2019, she was living on the streets while regularly abusing methamphetamines. *See id*. at 81. S.W.'s biological father, J.E. ("Father") (collectively with Mother, "Parents"), has never been married to Mother and struggles with drug addiction.[1] *See id*. at 81-83. In December 2019, prior to S.W.'s birth, Mother was arrested and charged with possession of narcotics and drug paraphernalia. *See* Exhibit G7-G8. Although initially incarcerated, Mother posted bail in March 2020 with the assistance of I.R.-A's parents and was released to their home with an ankle monitor. *See* N.T., 7/17/24, at 47, 81, 178. The precise terms of Mother's release from prison, however, are not evident from the certified record.

At the time of S.W.'s birth, Mother tested positive for methamphetamines. *See id*. at 88, 188. Consequently, Bucks County Children and Youth ("CYF" or "the Agency") became involved and instituted a

---

[1] The terms of Father's incarceration and subsequent release are not clear from the certified record. Upon his release, Father resumed living a "drug life" while homeless on the streets. *See* Report of the Custody Conference Officer, 10/17/23, at 2. The certified record indicates Father participated in the first custody hearing prior to the entry of the *interim* custody order in May 2021. *See* N.T., 7/17/24, at 197. Thereafter, our review of the certified record indicates Father has not participated in these proceedings.

safety plan providing Mother could not be left alone with S.W. without the presence of, *inter alia*, Guardians.[2]  **See id**. at 45, 144, 188-90.

On June 30, 2020, Mother stayed overnight with Father at a local hotel in violation of the conditions of her release from prison.  **See id**. at 83, 184-85.  That evening, Mother left S.W. in the care of I.R.-A's parents.  **See id**. at 184.  The same night, an unnamed man confronted the family at their home and demanded to speak with Parents while claiming they were using his vehicle without permission.  **See id**. at 184-85.  Because of these events, I.R.-A's parents decided Mother could no longer remain living in their home.  **See id**. at 185.

Thereafter, Mother was homeless for several months beginning in July 2020.  **See id**. at 92-94.  S.W. remained in the care of I.R.-A's parents, while Mother took no immediate action regarding custody.  In December 2020, Mother was arrested and, eventually, charged with another count of possession of narcotics.  **See** Exhibit G9.  It is unclear whether Mother was incarcerated in connection with these charges.

_____

[2] Although a copy of the safety plan was introduced during these proceedings, the court deemed a portion of it illegible.  **See** Exhibit G5; N.T., 7/17/24, at 109-10.  As cited above, the specific provisions of the safety plan were attested to by the parties, and we detect no disagreements in their respective testimonies.  **See** N.T., 7/17/24, at 45, 144, 188-90 (comparing the consistent testimonies of Mother and Ms. Schaffer concerning the parameters of the safety plan).

Eventually, at the Guardians' request, S.W. was sent to live with the Guardians in their home. *See* N.T., 7/17/24, at 191. At that time, CYF was unable to establish contact with Mother and, consequently, the Agency independently approved the changes to the safety plan concerning S.W.'s placement with Guardians. *See id*.

Mother has three older biological children, including two sons and a daughter, who are not related to Father. *See id*. at 97-99. At the time of these proceedings, Mother's oldest son had recently turned nineteen, left Mother's care, and relocated to Philadelphia. *See id*. at 97. Similarly, Mother's older daughter also lives in the Philadelphia area with her biological father and had no contact with Mother.[3] *See id*. at 98. Finally, Mother's youngest son was approximately fourteen years old at the time of these events and had been in the care of Mother's brother, J.Y. ("Maternal Uncle"), in North Carolina since the age of six. *See id*. at 18, 48-49.

Following her arrest in December 2020, Mother contacted Maternal Uncle and requested his assistance in reclaiming custody of S.W. *See id*. at 12, 17-18. In January 2021, he travelled to Pennsylvania and met with Mother. *See id*. at 17-18. At this meeting, Mother executed a notarized

_____

[3] In her testimony, Mother claimed her eldest daughter was "basically kidnapped" by her biological father. *See* N.T., 7/17/24, at 98. There is nothing in the certified record corroborating this claim or otherwise suggesting that Mother's loss of custody was the result of custodial kidnapping.

affidavit that purported to transfer custody of S.W. to Maternal Uncle. *See* Exhibit G1. That day, Maternal Uncle presented this document to Guardians at their home and demanded they surrender S.W. to him. *See* N.T., 7/17/24, at 20. Guardians refused and police, who responded to the scene at Maternal Uncle's request, declined to force a custody transfer. *See id*. at 20-22. Maternal Uncle returned to North Carolina without the child.[4] *See id*. at 22-23.

In January 2021, Guardians filed a custody petition against Maternal Uncle. In February 2021, Maternal Uncle filed a competing custody complaint against Guardians and Parents. These petitions each sought sole legal and primary physical custody of S.W. Following an evidentiary hearing, the custody court filed an interim order on May 11, 2021, which awarded Guardians sole legal custody and primary physical custody of S.W. *See* Interim Order, 5/11/21, at ¶¶ 1(a), 2. The court granted Maternal Uncle partial physical custody of S.W. one weekend per month in North Carolina, with the option for additional "weekend day" visits in Pennsylvania. *Id*. at ¶ 2(a)-(b). The order also permitted Mother to have "weekly supervised visits" with S.W. subject to the agreement of Guardians. *Id*. at ¶ 2(f).

_____

[4] No copy of Guardians' initial custody petition appears in the certified record. Nor is there an entry on the docket of this case. We discern that such a filing was made from the testimonies of Maternal Uncle and Mother. *See* N.T., 7/17/24, at 22, 24, 26, 140. Given Maternal Uncle averred he received notice, we conclude Guardians named him in this complaint.

In August 2021, Maternal Uncle filed a motion requesting a supplemental hearing, which was granted. The court held the requested hearing in October 2021, which Mother attended. During this proceeding, Mother was taken into custody in connection with the criminal cases noted above. *See* N.T., 7/17/24, at 29-30. Subsequently, the court entered a second interim custody order that largely preserved the existing awards. Of note, Maternal Uncle's physical custody award was modified to one weekend in North Carolina every two months along with "week-long visits" in the summer once S.W. was "fully verbal." *See* Interim Order, 11/5/21, at ¶ 2(a).

Upon her release from prison in October 2021, Mother relocated to North Carolina and began residing with Maternal Uncle. *See* N.T., 7/17/24, at 30. Mother has never exercised, or attempted to exercise, her custodial time with S.W. in Pennsylvania. *See id*. at 59-60. For approximately two years, no party filed further custody petitions. During this time, the parties abided by the parameters of the second interim custody order and S.W.'s bi-monthly visits with Maternal Uncle in North Carolina took place. Contemporaneously, Mother's still-pending criminal matters in Pennsylvania were resolved via guilty pleas in February 2022, and October 2022, respectively. Mother was sentenced to an aggregate term of eighteen months of probation and her supervision was transferred to North Carolina.

While residing in North Carolina, Mother suffered a month-long relapse related to cocaine in approximately May 2022.[5]  ***See id***. at 56, 94-95.  The same month, she was arrested and charged under North Carolina law with misdemeanor larceny after she stole from her employer to sustain her drug habit.  ***See*** Exhibit G6; N.T., 7/17/24, at 95-96.  Mother pled guilty and was sentenced to one year of probation beginning in October 2023.  ***Id***.

In May 2023, Mother sought out and began receiving treatment for opioid use disorder and stimulant use disorder from Restoration Family Services, Inc., in North Carolina ("Restoration").  ***See*** Exhibit M1.  Mother was successfully discharged from treatment in April 2024, after achieving "abstinence" while being drug tested twice per week in the program.  ***Id***.; ***see also*** N.T., 7/17/24, at 76.  Following her discharge from Restoration, Mother has been providing monthly urine tests to her probation officer in North Carolina, which she reports have also been clean.  ***See*** N.T., 7/17/24, at 96.

Shortly after entering treatment, Mother filed a *pro se* petition to modify custody in August 2023, seeking partial physical custody of S.W.  Following a lengthy continuance entered at the request of the parties, the custody court held a hearing on Mother's modification petition in July 2024.  Mother

_____

[5]   Maternal Uncle has a criminal history related to the possession and distribution of cocaine.  ***See*** N.T., 7/17/24, at 56.  Although there is conflicting information in the certified record, we discern Maternal Uncle was convicted of two separate offenses related to the manufacture, sale, delivery, holding, offering for sale or possession of a controlled substance between 1989 and 1996.  He served a total of approximately fifteen years in prison.

appeared in person and was represented by counsel. Maternal Uncle appeared as a *pro se* litigant.[6] The court heard testimony from Mother, Maternal Uncle, S.S., and Tamara Wheeler ("Ms. Wheeler"), who is S.W.'s daycare teacher in Pennsylvania. During her testimony, Mother clarified she was requesting her partial physical custody of S.W. be expanded to one week-long visit every month. *See id*. at 71.

Subsequently, the court entered a final custody order that modified the existing terms of physical custody, as follows:

6. [Guardians] shall have primary physical custody of the minor child, subject to [Maternal] Uncle and Mother's periods of partial physical custody as follows:

   a. [Guardians] shall transport [S.W.] to North Carolina every other month for a weekend visit with [Maternal] Uncle and Mother from Friday through Sunday afternoon. The dates and times shall be agreed upon by the parties.

   b. On the months [when] [Guardians] are not obligated to travel to North Carolina for a visit, [Maternal] Uncle and Mother shall be entitled to a weekend visit with [S.W.] in Bucks County, Pennsylvania. The dates and times of that visit shall be agreed upon by the parties.

   c. [Guardians] shall transport the minor child to North Carolina for a week[]long visit with [Maternal] Uncle and Mother during the summer. The dates and times of the week[]long visit shall be agreed upon by the parties.

   d. [Maternal] Uncle and Mother shall receive two additional weeks of partial physical custody with [S.W.] in Bucks County, Pennsylvania. Should the parties exercise those additional two weeks of custodial time, [Maternal] Uncle

---

[6] Maternal Uncle elected to represent himself beginning in April 2022. *See* Substitution of Appearance, 4/11/22, at 1 (unpaginated).

and Mother shall provide to [Guardians] information about where they are staying and with whom if [S.W.] is staying overnight. During these visits[,] [S.W.] shall continue to attend school and other activities for which [Guardians] will facilitate transportation for and from as they have legal custody.

    e.   Mother's visits with [S.W.] in North Carolina shall be supervised by [Maternal] Uncle, . . . or his wife, [P.Y.].

    f.   Mother's visits with [S.W.] in Bucks County, Pennsylvania shall be supervised by [Maternal] Uncle, . . . his wife, [Guardians], or another mutually agreeable supervisor.

Final Custody Order, 7/24/24, at ¶ 6(a)-(f).

Attached to the final custody order was a copy of an excerpt of the custody hearing, wherein the court addressed the custody factors set forth at 23 Pa.C.S.A. § 5328(a), as well as the relocation factors set forth at 23 Pa.C.S.A. § 5337(h).[7] **See** N.T., 7/17/24, at 221-31.

Mother filed a timely notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). Maternal Uncle declined to file either a notice of appeal, or a brief, in this matter. The trial court filed an opinion.

Mother has raised the following issues for our consideration:

I.    Whether the trial court erred by applying the wrong legal standard in determining a custody dispute when it failed to assess the evidence against the heavy weight of the biological mother's *prima facie* right to custody, the rebuttal of which required

---

[7] The custody court concluded Mother's request for modification amounted to a request for relocation given the distance between the parties' respective homes. **See id**. at 8 ("I view this case, essentially, as a relocation petition."). Mother has not challenged this aspect of the court's holding.

evidence of compelling reasons that the child's best interest will be served by awarding custody to non-biological third parties rather than the biological mother[?]

II.  Whether the trial court erred by entering a final custody order that confers permanent status on third parties caring for a minor child rather than an interim order that confers temporary care status[?]

Mother's Brief at 7.

We begin by reviewing our relevant standard and scope of review in custody matters, which this Court has aptly summarized, as follows:

Our standard of review over a custody order is for a gross abuse of discretion.  Such an abuse of discretion will only be found if the trial court, in reaching its conclusion, overrides or misapplies the law, or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias, or ill-will as shown by the evidence of record.

In reviewing a custody order, we must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the trial court who viewed and assessed the witnesses first-hand.  However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record.  We may reject the conclusions of the trial court only if they involve an error of law[] or are unreasonable in light of the sustainable findings of the trial court.

***Rogowski v. Kirven***, 291 A.3d 50, 60-61 (Pa. Super. 2023) (citations and brackets omitted, paragraphing altered).

Mother's first claim for relief does not address the specific and individual findings of the custody court pursuant to the various factors relating to custody in Section 5328(a) or relocation in Section 5337(h).  ***See*** Mother's

- 10 -

Brief at 19-28. Rather, Mother contends the court's overall reasoning was inherently flawed because it allegedly failed to acknowledge Mother's *prima facie* right to custody of her biological daughter. **See id**. at 22 ("[T]he trial court failed to apply the correct legal standard of production and persuasion when determining the competing custody claims between [Mother] and [Guardians] over [S.W.]. No where [sic] in its reasoning does the trial court indicate that it considered [Mother's] *prima facie* right to custody over her daughter."). Instead, Mother argues the court subjected her request for modification of custody to excessive scrutiny by allegedly starting from "the premise that [S.W.] is better off with [Guardians]," and then requiring Mother to rebut that presumption. **Id**. at 22-23. As she did in the trial court, **see** N.T., 7/17/24, at 218 (asserting the trial court lacked "the authority to substitute the court's idea of what is best for the child for that of the mother"), Mother claims her biological connection with S.W. should override all other considerations.). We disagree.

Although Mother discusses cases related to standing in her brief, she has **not** framed her appellate argument as a challenge to Guardians' standing to seek custody of S.W.[8] Rather, Mother solely contests the trial court's

---

[8] In the trial court, Mother's attorney suggested Guardians lacked standing to have custody of S.W. **See** N.T., 7/17/24, at 8 (counsel asserts, "I view it as a standing case. . . . [I]t is just a basic case of, hey, we have a mom here who is a fit parent[,] and therefore, she gets to make the decisions for her child as she fits."). As noted above, however, Mother abandoned her standing

*(Footnote Continued Next Page)*

evaluation of the evidence presented. The gravamen of her claim is that the trial court erred in weighing the evidence of record. *See* Mother's Brief at 17 (asserting "the trial court erred by not weighing the evidence with the balance tipped in [Mother's] favor as the biological mother[.]").

It is true that when a custody dispute arises "between a biological parent and a third party, the burden of proof is not evenly balanced." *Charles v. Stehlik*, 744 A.2d 1255, 1258 (Pa. 2000). However, a mother's *prima facie* right to custody as a biological parent does not control the overriding concern for the child's best interests. *Id*. at 1258-59 (stating that "in custody disputes, the fundamental issue is the best interest of the child" and a biological parent's right to custody will not trump the best interests of the child"). Our Supreme Court made clear a biological parent "forfeit[s] their *prima facie* right to custody if convincing reasons appear that the child's best interest will be served by an award to the third party." *Id*. (quotation marks omitted).

This Court interpreted *Stehlik's* recognition of the biological parents' *prima facie* custody right as follows:

> What the judge must do . . . is first, hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side. *These principles*

_____

claim in this Court. Specifically, her brief is bereft of any argument that Guardians lacked standing. To the extent Mother asserts a standing claim, that claim is waived. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017) (explaining claims not asserted in an appellant's statement of questions presented, and not developed with pertinent legal argument, are waived); *see also* Pa.R.A.P. 2116(a), 2119(a).

- 12 -

> ***do not preclude an award of custody to the non-parent.
> Rather, they simply instruct the hearing judge that the non-
> parent bears the burden of persuasion and that the non-
> parent's burden is heavy.***

***Jones v. Jones***, 884 A.2d 915, 918 (Pa. Super. 2005) (citations and quotation marks omitted, paragraphing altered, emphasis added).  Thus, a third-party petitioner need not prove a biological parent is "unfit," but only produce clear and convincing evidence that a child would be "better off" with the third party as their primary custodian.  ***Id***.

In its Rule 1925 opinion, the trial court acknowledged it did not "explicitly invoke" this precedent when making its assessment of the custody and relocation factors.  ***See*** Trial Court Opinion, 8/27/24, at 10.  Nonetheless, the court maintained its holding was "firmly justified" even when applying the evidentiary standard favoring a biological parent ***Stehlik*** recognized.  ***Id***.  The court concluded Mother's "actions" and "inaction" were "repeatedly contrary to [S.W.'s] best interest, in stark contrast to [Guardians], who have consistently been a source of stability and support for the child."  ***Id***. at 10-11.  As discussed *infra*, the certified record supports these findings.

Initially, we observe no error because the trial court did not explicitly state Mother's *prima facie* right to custody in its on-the-record explanation of its custody determination.  The trial court provided a thorough assessment of the relevant custody factors at the conclusion of the hearing.  ***See*** N.T., 7/17/24, at 220-33 (citing 23 Pa.C.S. §§ 5328(a), 5337(h)).  Further, the trial court addressed Mother's *prima facie* right to custody pursuant to ***Stehlik*** in

its opinion. *See* Trial Court Opinion, 8/27/24, at 8-11; *see also M.J.M. v. M.L.G.*, 63 A.3d 331, 337 (Pa. Super. 2013) (observing it is not error for a trial court to "expand[]" upon its custody findings in a subsequent Rule 1925(a) filing, and that such a practice is "eminently reasonable"). Thus, there is no merit in Mother's argument regarding the trial court's misapprehension of the relevant legal standards.

Here, the trial court considered the evidence of record under the appropriate legal standards and concluded S.W.'s best interests would be served by maintaining the existing custody award. The court summarized its rationale as follows:

> [Mother], as the biological parent, is . . . entitled to a presumption in her favor regarding custody. However, this presumption has been rebutted, as reflected in the record from the hearing on July 17, 2024.
>
> The evidence indicates Mother left the child with [Guardians] only twenty-seven . . . days after birth. [Guardians] have provided steadfast care for [S.W.] since before that time. It is further established that [Mother], on her own accord, relocated over 500 miles away from [S.W.] to North Carolina to live with Maternal Uncle, despite [S.W.'s] entire life being spent in Pennsylvania, and despite the pendency of these proceedings at the time she chose to relocate without [S.W.]. Additionally, [Guardians] have consistently offered [Mother] and Maternal Uncle opportunities to visit [S.W.] and stay with them, which seemingly have not been utilized.
>
> The court also noted that Maternal Uncle, rather than [Mother], remains the legal guardian to [Mother's youngest son]. The court takes this as a clear indication that [Mother] has failed to fulfill her obligations to provide for the needs and support of her children. Although [Mother] has made progress toward her goal of full custody, further advancement is necessary for [Mother] to gain more custodial rights. While positive, the

changes [Mother] has made in her personal circumstances toward reaching her goal of full custody are either too recent, or not concrete enough, to prove her ability to assume primary custody of [S.W.]. It is also worth noting that during the litigation process, [Mother] and Maternal Uncle voluntarily reduced their time with [S.W.], despite the availability of opportunities for additional[,] meaningful custody.

*See* Trial Court Opinion, 8/27/24, at 8-9 (citations omitted).

Mother has relied solely upon her *prima facie* right to custody and elected not to challenge the veracity or accuracy of the trial court's factual findings. Nevertheless, to the extent Mother contends the evidence was insufficient to overcome her *prima facie* right to custody, the trial court's findings, recited above, are amply supported by the certified record.

As detailed in the factual summary above, Mother struggled with significant problems related to drug addiction and law-breaking throughout these proceedings. Because of these troubles, Mother effectively abandoned S.W. to the care of Guardians beginning in June 2020. Thereafter, she alternated between homelessness and incarceration until October 2021, when she voluntarily chose to relocate to North Carolina. Following her relocation, Mother's issues with narcotics and illegal behavior continued for approximately two years until she enrolled in treatment through Restoration. Mother successfully completed treatment in April 2024. At the time of the subject hearing in July 2024, therefore, Mother had maintained her sobriety outside of the controlled environment of a treatment program with regular drug

screening for only three months. Mother also remained on probation in North Carolina at the time of the subject hearing.

Irrespective of Mother's short-term successes in addressing her substance abuse problem, there has not been a concomitant improvement in her interactions with S.W. Mother was entitled to "weekly supervised visits" with S.W. under the terms of both the first and second interim custody orders. Interim Order, 5/12/21, at ¶ 2(f); Interim Order, 11/5/21, at ¶ 2(g). The trial court also provided Mother with the opportunity to have video calls with S.W. on a regular basis. Interim Order, 11/5/21, at ¶ 2(d).

Despite these awards of the opportunity for additional contact with S.W., the testimony of Mother and Maternal Uncle both indicated Mother has only interacted with S.W. during Maternal Uncle's bi-monthly custodial time in North Carolina and during a one-time week-long visit during the summer of 2023. *See* N.T., 7/17/24, at 40, 62, 106. Although Mother avers she cannot afford to travel from North Carolina to Pennsylvania to exercise her custodial time, the record indicates *she chose to relocate 500 miles away* without regard to the potential impact upon her relationship with S.W. *See id*. at 30, 103, 123. Furthermore, S.S. testified Mother has rejected Guardians' offers to help her with the financial expenses of visiting Pennsylvania. *See id*. at 162-63; Exhibit G13. Finally, Mother also conceded in her testimony she does not regularly communicate with S.W. via FaceTime. *See* N.T., 7/17/24, at 126.

Mother's request for additional physical custody of S.W. is plainly at odds with her actions throughout the entire lifetime of this matter. Mother has not prioritized her ability to interact with S.W. on a regular and consistent basis, or S.W.'s best interests.

In Mother's voluntary absence, S.S. testified she and I.R.-A. have been caring for S.W. since she was approximately one month old. ***See id***. at 146. As her sole legal custodians, Guardians have enrolled S.W. in a structured, accredited pre-K program she attends year-round. ***See id***. at 152-53, 156. Indeed, Mother's own testimony indicated Guardians have been taking good care of S.W., and her physical, emotional, and developmental needs are being met. ***See id***. at 104-05. The record also indicates S.W. has an ongoing relationship in Bucks County with two of her biological half-sisters through Father. ***See id***. at 153-54.

There is also testimony indicating S.W. is suffering significant emotional turmoil because of her current, limited contact with Mother. S.S. testified that S.W. is often "hesitant" and "cries" during the custody exchanges in North Carolina. ***Id***. at 164. S.S. also averred at the most recent custody exchange before the subject hearing in May 2024, S.W. resorted to "grasping" onto her car seat "saying she did not want to go and don't make her go." ***Id***. at 164-65. In sharp contrast, S.W. was "excited" when she was able to return to the custody of Guardians. ***Id***. at 165.

Ms. Wheeler's testimony corroborated these concerns. Specifically, she reported S.W. has begun displaying violent, aggressive, and defiant behavior immediately following her weekend visits to North Carolina, which typically takes several days to resolve. *See id*. at 209. Ms. Wheeler explained these outbursts were a marked departure from S.W.'s typical personality, which is usually silly, lovable, and friendly. *See id*. at 208.

More pointedly, S.S. testified Mother's proposed monthly, week-long visits would not be in S.W.'s best interests. *See id*. at 156. S.S. averred disrupting S.W.'s stability in this fashion would not be "feasible," particularly given the significant expenses and logistical obligations Guardians were already taking on by being required to take a four-year-old child on an eight-hour road trip every two months. *See id*. at 156-59. Along similar lines, Mother's testimony indicates she currently works the third shift and, consequently, would either be absent or asleep during the proposed periods of increased physical custody. *See id*. at 105 (indicating Mother would be able to spend, at most, "a few hours" per day with S.W.). Mother also conceded it was in S.W.'s best interest to be enrolled in a single pre-K program, as opposed to separate programs in separate states. *See id*. at 106

Based upon the foregoing, we find no abuse of discretion or error of law in the trial court's holding. The evidence and testimony of record clearly rebutted Mother's *prima facie* right to custody of S.W. *See*, *e.g*., *Jones*, 884 A.2d at 919. No relief is due with respect to Mother's first claim.

In her second issue, Mother baldly asserts it was improper for the trial court to enter a "final" custody order. *See* Mother's Brief at 27 (asserting "[t]he entry of a final custody order is significant in this action because it confers a permanency on [Guardians'] custody award that equates . . . to parental status. An interim order would confer a more appropriate status: that [Guardians] are temporary caregivers while [Mother] works to stabilize herself."). No relief is due with respect to this claim.

Mother's discussion of her claim is bereft of citations to either the record or to pertinent legal authorities. *See* id. at 26-28. This Court has consistently held "it is an appellant's duty to present arguments that are sufficiently developed . . . with citations to legal authorities." *In re R.D.*, 44 A.3d 657, 674 (Pa. Super. 2012). Furthermore, "[w]hen an appellant cites no authority supporting an argument, this Court is inclined to believe there is none." *Commonwealth v. Reyes-Rodriguez*, 111 A.3d 775, 781 (Pa. Super. 2015) (citing Pa.R.A.P. 2119(a)-(b)). Accordingly, we deem this claim to be waived. *See B.S.G. v. D.M.C.*, 255 A.3d 528, 535 (Pa. Super. 2021) (holding a father waived claims in custody appeal by failing to support his arguments "by reference to the record and citation to authority").

Even setting aside the lack of obvious support for Mother's position, we note that her arguments erroneously elevate form over substance. Specifically, this Court has recognized the "uniqueness" of custody orders compared to orders in other civil actions. *Kassam v. Kassam*, 811 A.2d

1023, 1025 (Pa. Super. 2002). The designations of "interim" and "final" custody orders relate principally to the appealability of such orders, as opposed to their permanency. ***See generally id***. at 1024-28. Indeed, "[p]etitions for modification of custody orders may be entertained at any time without regard to whether there have been any material changes which would warrant a reevaluation." ***J.P. v. J.S.***, 214 A.3d 1284, 1290 (Pa. Super. 2019) (citation omitted). Thus, nothing in the trial court's "final" custody order precludes Mother from seeking modification at some later date. ***See Kassam***, 811 A.2d at 1025 (citation omitted) ("Child custody orders are temporary in nature and always subject to change if new circumstances affect the welfare of a child.").

Based upon the foregoing, we discern no abuse of discretion or error of law in the trial court's findings. Thus, we affirm the underlying custody order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/17/2025